THE HEIL CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81313.    Filed September 28, 1962.

*Frederic Sammond, Esq.*, and *William J. Willis, Esq.*, for the petitioner.

*Joel Yonover, Esq.*, for the respondent.

WITHEY, *Judge:* The Commissioner has determined a deficiency in the income tax of petitioner for the fiscal year ended October 31, 1954, in the amount of $271,269.67. The only issue here presented is whether the amount of $1 million paid it under the terms of a contract constitutes ordinary income or capital gain.

### FINDINGS OF FACT.

The stipulated facts are found as stipulated.

The petitioner, the Heil Co., is a corporation organized under the laws of the State of Wisconsin, with its principal office at 3000 West Montana Street, Milwaukee, Wisconsin.

On January 14, 1955, the petitioner filed its income tax return for the fiscal year beginning November 1, 1953, and ending October 31, 1954, with the district director of internal revenue, Milwaukee, Wisconsin.

During its fiscal year ended October 31, 1954, and prior thereto and thereafter, petitioner was a manufacturer and a fabricator of heavy equipment including, among other things, gasoline and milk tanks for semitrailer trucks, truck bodies, hoists, earth-moving machin-

ery, and agricultural and industrial dehydrators. The petitioner had four divisions, a body and hoist division, a tank division, a heating division, and a road machinery division.

From the early forties and until December 17, 1953, petitioner designed, produced, and was marketing a line of medium and heavy earth-moving machinery under the trade name "Heiliner." The Heiliner was produced by petitioner's road machinery division. Over the period from the early forties through 1953, the name "Heiliner" had developed value.

The Heiliner consisted of a two-wheel rubber-tired tractor and interchangeable two-wheel rubber-tired wagon or two-wheel rubber-tired scraper used in combination with the tractors. The Heiliner was being produced in two series known as the Series 800 and the Series 500. As of December 17, 1953, petitioner had under development, but not as yet being manufactured, two additional series of the Heiliner known as Series 400 and the Series 900.

The Heiliner was usually sold as a unit, that is, either a tractor in combination with a wagon or in combination with a scraper. The tractor could not have been used alone without either a scraper or a wagon. No other wagon or scraper was manufactured by any company other than petitioner that could fit the Heiliner tractor and be used with it.

The petitioner held 14 basic patents on the tractor unit: 7 American, 3 Canadian, 2 Australian, and 2 Mexican. These patents are listed below with their patent number, issue date, and the expiration date of the patent:

| | Patent No. | Issue date | Expiration date |
|---|---|---|---|
| United States Letters Patent: | | | |
| French—Hydraulic steering gear | 2,321,377 | 6/8/43 | 6/8/60 |
| French—Winch assembly | 2,321,905 | 6/15/43 | 6/15/60 |
| French—Hydraulic steering gear | 2,334,918 | 11/23/43 | 11/23/60 |
| French & Hendricksen—wheel and axle assembly | 2,348,801 | 5/16/44 | 5/16/61 |
| French—Steering mechanism for two-wheel tractor | 2,361,935 | 11/7/44 | 11/7/61 |
| French—Steering mechanism for two-wheel tractor | 2,362,262 | 11/7/44 | 11/7/61 |
| French—Steering mechanism for two-wheel tractor | 2,461,596 | 2/15/49 | 2/15/66 |
| Canadian Letters Patent: | | | |
| French—Hydraulic steering gear | 405,647 | 6/23/42 | 6/23/59 |
| French—Steering mechanism for two-wheel tractor | 425,443 | 2/6/45 | 2/6/62 |
| French—Steering mechanism for two-wheel tractor | 425,444 | 2/16/45 | 2/16/62 |
| Australian Letters Patent: | | | |
| French—Steering mechanism for two-wheel tractor | 122,599 | 3/21/47 | 12/26/58 |
| French—Steering mechanism for two-wheel tractor | 122,600 | 3/21/47 | 12/29/59 |
| Mexican Letters: | | | |
| French—Steering mechanism for two-wheel tractor | 43,983 | 5/7/45 | 12/26/57 |
| French—Steering mechanism for two-wheel tractor | 43,882 | 3/26/45 | 1/29/58 |

The foreign patents covered the same items covered by the basic American patents.

The Heiliner tractor was made up of hundreds of parts. The manufacture of the tractor was primarily an assembly process by petitioner. The biggest portion of the components of the tractor were purchased

from other manufacturers, including the major parts, as opposed to being manufactured by petitioner.

The petitioner also held patents relating to the scraper and wagon components of the Heiliner. The great majority of the scraper components and wagon components were manufactured rather than purchased and assembled.

During the fiscal period ended December 31, 1949, through the fiscal period ended October 31, 1960, the petitioner sold the following number of Heiliner tractor and scraper units and scrapers or wagons without tractors:

| Fiscal period ended— | Tractor and scraper units [1] | Scrapers or wagons (without tractors) |
|---|---|---|
| Dec. 31, 1949 | 20 | 63 |
| Dec. 31, 1950 | 37 | 104 |
| Dec. 31, 1951 | [2] 80 | 377 |
| Oct. 31, 1952 (10 months) | [3] 42 | 296 |
| Oct. 31, 1953 | 111 | 29 |
| Oct. 31, 1954 | 180 | 47 |
| Oct. 31, 1955 | 112 | 53 |
| Oct. 31, 1956 | 234 | 19 |
| Oct. 31, 1957 | 283 | 114 |
| Oct. 31, 1958 | 144 | 18 |
| Oct. 31, 1959 | | 159 |
| Oct. 31, 1960 | 59 | 22 |

[1] Exclusive of 16 demonstrator and used units on hand at Dec. 17, 1953, which were not sold to International Harvester but to other customers.
[2] Includes 44 to U.S. Government.
[3] Includes 22 to U.S. Government.

The following is a summary of petitioner's sales as a whole, for petitioner's road machinery division (of which Heiliner was a part), for the Heiliner, and a gross profit less selling expenses for the fiscal period December 31, 1949, through the fiscal period ended October 31, 1956, for petitioner as a whole and for its road machinery division:

| Year | Sales | | | Gross profit—Less selling expenses | | | |
|---|---|---|---|---|---|---|---|
| | Total company | Road machinery division | Tractors, scrapers, and wagons | Total company | | Road machinery division | |
| | | | | Amount | % of sales | Amount | % of sales |
| 1949 [1] | $14,954,000 | $2,529,000 | [5] $500,000 | $426,000 | 2.85 | $193,000 | 7.63 |
| 1950 | 21,059,000 | 3,431,000 | [5] 900,000 | 559,000 | 2.65 | 224,000 | 6.53 |
| 1951 [2] | 32,629,000 | 5,618,000 | [5] 1,600,000 | 629,000 | 1.93 | (366,000) | (6.34) |
| 1952 (10 mos.) [3] | 37,006,000 | 4,926,000 | 910,000 | 2,589,000 | 7.00 | 120,000 | 2.44 |
| 1953 | 36,256,000 | 4,580,000 | 2,385,000 | 2,856,000 | 7.88 | 36,000 | .79 |
| 1954 | 36,737,000 | 6,134,000 | 3,945,000 | 3,137,000 | 8.54 | 166,000 | 2.71 |
| 1955 [4] | 30,575,000 | 5,207,000 | 2,603,000 | 440,000 | 1.44 | (584,000) | (11.22) |
| 1956 | 35,160,000 | 8,252,000 | 5,573,000 | 2,115,000 | 6.02 | (153,000) | (1.85) |

[1] Hourly employees of the company were out on strike for 3 months during 1949.
[2] Sales included two major defense contracts for road machinery equipment on which substantial losses were sustained in 1951.
[3] In 1952, company shifted from a calendar year basis to a fiscal year, ending October 31.
[4] In 1955—affected adversely by continual stops, starts, changes, and crash programs of the road machinery division on Harvester contract.
[5] Heiliner tractor and scraper sales for 1949, 1950, and 1951 are approximate amounts based on units sold.

NOTE: Gross profit from operations less selling expense is *after* all manufacturing, engineering, and selling expenses, but *before* administrative expenses and miscellaneous nonoperating income and miscellaneous charges such as interest, pensions, etc.
Sales of equipment under "defense contracts" were substantial in the years 1951–1954, inclusive, and in 1960.

During the period prior to December 17, 1953, the Heiliner tractors, scrapers, and wagons were distributed through independent distributors who also distributed other manufacturers' products.

Prior to 1951, the rubber-tired earth-moving equipment business was in the hands of small companies, as for example, LeTourneau, Euclid, and Woolridge, and the Heil Company. Up to that time, the companies that manufactured the crawler-type tractors were not in the rubber-tired business. The crawler tractor manufacturing companies were usually larger than the companies that manufactured the rubber-tired tractors.

One principal difference between a crawler-type tractor and a rubber-tired tractor is that the rubber-tired tractor is faster and more powerful in moving materials.

Beginning in 1951 the larger crawler-type tractor manufacturers were buying up the smaller independent rubber-tired tractor manufacturers. Westinghouse-Air Brake had purchased LeTourneau, Allis-Chalmers had purchased LaPlante Choate, and General Motors had purchased Euclid. The crawler tractor distributors prior to 1951 had been selling the rubber-tired tractors manufactured by the independent companies. The distributors, subsequent to 1951, wished to sell their own rubber-tired line. Some of the distributors selling the Heiliner were no longer allowed to sell it.

Because of its comparatively small size and correspondingly weak distributing organization, petitioner in 1953 did not desire to continue manufacturing the Heiliner tractors and try to sell them in competition with the larger manufacturers of rubber-tired earth-moving equipment.

International Harvester Company, hereinafter referred to as Harvester, manufactured, among other things, trucks and tractors for earth moving. This equipment was manufactured in Harvester's Industrial Power Division.

Harvester distributed its road machinery equipment through a series of independent distributors. These distributors handled other product lines in the same fields including that manufactured by the petitioner, Bucyrus-Erie, and others.

Some of Harvester's competitors in the road machinery business in 1953 were LaPlante Choate, Caterpillar, Euclid, and LeTourneau. All of these companies were manufacturing two-wheel rubber-tired tractors. As of December 17, 1953, Harvester was neither manufacturing nor marketing two-wheel rubber-tired tractors or scrapers or wagons. Harvester did have a two-wheel rubber-tired tractor under design as of that date. To keep up with its competition, in 1953 Harvester wanted to get into the two-wheel rubber-tired business in a hurry.

In the fall of 1953, petitioner and Harvester entered into negotiations on a contract concerning the Heiliner unit. The negotiations were culminated in a contract dated December 17, 1953. The contract was to last for a period of 11 years and was cancelable at the end of the fifth aniversary or the eighth anniversary of the signing of the contract.

Under the terms of the contract, *"Two-Wheel Tractors"* were defined as—

two-wheel rubber tired tractors of the types and quality of tractors now manufactured by Heil which are used in "Heiliners" of the Series 500 and the Series 800, and of the types now under development (the Series 400 and the Series 900) and which may be developed (pursuant to Subdivision 4) by Heil;

*"Scrapers"* and *"Wagons"* were defined under the contract as—

two-wheel rubber tired scrapers and wagons of the types and quality now manufactured by Heil which are used in "Heiliners" of the Series 500 and the Series 800, and of the types now under development (the Series 400 and the Series 900) and which may be developed (pursuant to Subdivision 4) by Heil for use with Two-Wheel Tractors, or for use with four-wheel rubber tired tractors designed for industrial uses and which with a two-wheel rubber tired scraper or wagon are capable of performing operations similar to those performed by a Two-Wheel Tractor with such a wagon or scraper;

*"Four-Wheel Scrapers"* were defined under the contract as—

four-wheel rubber tired scrapers of the types, quality and sizes now manufactured by Heil; it is anticipated, however, that Heil will develop four-wheel rubber tired scrapers of sizes and types in addition to those now being manufactured by Heil, and when any such additional size or type has been developed by Heil, when its design has been approved by Harvester and when Heil notifies Harvester that Heil is ready to produce models of that design in commercial quantities, then four-wheel rubber tired scrapers of such design shall be included within the definition of Four-Wheel Scrapers;

*"Engineering and Manufacturing Information"* was defined under the contract as—

commercial and technical data as used by Heil for the manufacture of an item, all general and detailed engineering drawings, drawings of jigs and fixtures and of special tools, specifications of materials and heat treatment, engineering lists and notes on manufacturing operations, and shop practices and performance times;

"Specifications of materials and heat treatment" specifies material by standardized number "which can be looked up in any of the available data books and spells out" what goes into the materials. "Engineering lists" are "listed materials drawn by the engineering department, specifying quantity, part number, name of all the component parts of the machine." "Notes on manufacturing operations" are notes on the actual operation of manufacturing rather than dimensions.

*"Engineering and Manufacturing Assistance"* was defined under the contract as—

the making available by Heil at its Milwaukee plant of its engineers and experts familiar with the manufacturing and engineering problems relating to the prod-

uct involved; and the making available thereof for reasonable periods elsewhere than at Heil's Milwaukee plant subject to reimbursement to Heil of traveling expenses and of such compensation as may be agreed upon as reasonable from time to time between the parties;

The contract provided that Heil was obligated to produce and sell to Harvester as many two-wheel tractors of the Series 500 and 800 as Harvester required, up to an aggregate of 20 tractors a month, and to produce and sell to Harvester as many wagons, scrapers, and four-wheel scrapers as Harvester required.

Harvester agreed not to purchase two-wheel rubber-tired tractors similar to those that were the subject of the agreement from any manufacturer other than Heil in any calendar year during the life of the agreement until it had placed orders with Heil for 240 two-wheel tractors during the calendar year. In addition, Harvester agreed that it would not acquire two-wheel wagons or scrapers and four-wheel scrapers during any calendar year from any source other than Heil, until it placed firm orders with Heil for delivery in that calendar year of at least 1,000 such units in the aggregate. There was no guarantee, however, that Harvester would purchase any tractors or any wagons or scrapers. However, if tariff provisions, or restrictions imposed by foreign governments, or other factors should result in a condition under which Harvester could not be competitive in foreign countries in the sale of two-wheel tractors, scrapers, wagons, and four-wheel scrapers manufactured in the United States, and Heil, after request by Harvester, should be unable to make price reductions sufficient to make Harvester competitive, then Harvester could elect to procure such equipment for sale in such foreign countries from sources outside the United States. In such event, upon request, Heil was obligated to furnish engineering and manufacturing information and assistance and, as to scrapers, wagons, and four-wheel scrapers, was obligated to license qualified manufacturers in such countries upon such reasonable terms as the parties should mutually agree upon from time to time.

Heil was obligated to continue and was to bring to a conclusion its development work with respect to its proposed Series 400 and Series 900 two-wheel tractors, scrapers, and wagons, and was to construct and test pilot models of those series. Tests were to be conducted jointly with Harvester engineers, and the development of either series was not to be considered concluded until the pilot models had been tested to the extent required, and their performance had been approved by Harvester and Heil. During the development of these series, changes in design were to be effected as requested by Harvester. Harvester was to reimburse Heil for the additional cost of development work due to changes requested by Harvester when the requested change effected a change in basic design as distinguished from a

change indicated by tests as being a change required to produce a commercially acceptable product.

The contract provided that as soon as the development work on the Series 400 or Series 900 two-wheel tractors or scrapers or wagons was completed, if Harvester requested it, Heil was obligated to manufacture for Harvester the tractors, scrapers, and wagons of the Series 400 and 900. If Heil did go into the manufacture of the Series 400 or 900 tractors, then Harvester was required to furnish the necessary special tools for production, but the equipment would remain Harvester's.

Upon conclusion of the development work on the Series 400 and Series 900 two-wheel tractors, wagons, and scrapers, Heil was obligated to prepare the engineering and manufacturing information which is normally prepared preliminary to placing an item of similar nature in production. Upon request of Harvester, Heil was obligated to deliver to Harvester this engineering and manufacturing information insofar as it related to two-wheel tractors.

Heil was obligated to render to Harvester from time to time during the period of this agreement and as requested by Harvester, engineering and manufacturing assistance with respect to two-wheel tractors of all series.

Heil recognized the necessity of continuous study and redesigning of two-wheel tractors, wagons, scrapers, and four-wheel scrapers which were in production so that they would continue to be competitive in performance, quality, design, and price with competitive products of similar size, basic design, and capacity. This engineering function was to be performed by Heil with respect to products which it was manufacturing and was obligated to sell to Harvester, and Heil was to do all things necessary to and was to incorporate into the item it manufactured product changes resulting from the performance of this function. In performing this engineering function, Heil was to incorporate in the products referred to design changes requested by Harvester which, in Harvester's judgment, were required to keep the product competitive as aforesaid. If any request of Harvester required basic design changes as distinguished from changes to keep the product so competitive, the engineering of the changes were like other design changes, to be performed by the engineering staff of Heil, but Harvester was to reimburse Heil for the expense of engineering such changes and was to assume all responsibility for any such basic design changes not approved by Heil insofar as they affect the performance of the product involved. Upon Harvester's request Heil was to furnish to Harvester revised engineering and manufacturing information relating to two-wheel tractors to bring engineering and manufacturing information previously fur-

nished to Harvester current with all previous design changes not theretofore incorporated in the engineering and manufacturing information previously furnished to Harvester.

Heil was to assign promptly to Harvester all patents, domestic and foreign, patent applications, and inventions acquired by it on or after the date the contract was signed and during the period of this agreement which relate to or were material to the manufacture or sale of two-wheel tractors, and, upon the assignment by Heil to Harvester of any such patent, patent application, or invention, Harvester was thereupon to grant to Heil a nonexclusive royalty free license thereunder, and a nonexclusive royalty free license was also to be granted to Heil under any patent, patent application, or invention in which a Heil employee, agent, or representative was an inventor.

Heil assigned to Harvester all of its patents, patent applications, and inventions related to or material to the manufacture or sale of the two-wheel tractors, and at the same time Harvester granted Heil a nonexclusive royalty free license under the patents, patent applications, and inventions. The contract did not prevent Heil from manufacturing tractors for others.

Heil was obligated to deliver to Harvester all engineering and manufacturing information (current as of the time delivery of the information was made) relating to Heil's Series 500 and Series 800 two-wheel tractors.

Heil specifically warranted the products purchased from it by Harvester and specifically agreed to indemnify Harvester and its distributors against any and all claims based upon the contention that any product purchased under the contract was defective in workmanship, material, or design.

In the event any product sold to Harvester under the contract infringed or was alleged to infringe any United States letters patent owned by others and under which Harvester had no rights, Heil agreed, without cost to Harvester, to protect, defend, hold Harvester harmless from, and indemnify it against any and all claims, demands, suits, judgments, damages, royalties, actions, and causes of action whatsoever arising from any such infringement or alleged infringement, unless brought about by changes in design requested by Harvester and not approved by Heil, provided that Harvester immediately gave to Heil full control over the defense of any such action or cause of action for infringement and over any negotiations for settlement of any claims, charge of infringement, or suit for infringement.

In the event any two-wheel tractor manufactured by Harvester in accordance with engineering and manufacturing information furnished Harvester by Heil under the contract infringed or was alleged to infringe, because of the use of features contained in the engineer-

ing and manufacturing information, any United States letters patent owned by others and under which Harvester had no rights, Heil agreed without costs to hold Harvester harmless from and indemnify it against any and all claims, demands, suits, judgments, damages, royalties, action, and causes of action whatsoever arising from any such infringement or alleged infringement, unless brought about by changes in design requested by Harvester and not approved by Heil, provided that Heil's liability thereunder would not exceed the sum of $100,000 in the aggregate during the term of this agreement, that Harvester have full control over the defense of any such action or cause of action for infringement, and over any negotiations for settlement of any claims, charge of infringement, or suit for infringement, and that all attorneys' and counsels' fees in connection with any such suit would be assumed by Harvester. Although Harvester was to have such full control, it was to notify Heil of any such action or cause of action and was to keep Heil reasonably informed concerning the progress thereof and concerning any negotiations for settlement. In applying the $100,000 limitation provided in this paragraph, Heil was to hold harmless and indemnify Harvester as above set forth to the full amount of any claim or claims coming under this paragraph until it had protected Harvester to the extent of said sum of $100,000.

After the date of the agreement Heil was not to use the name "Heiliner" on or in connection with any two-wheel tractor, wagon, scraper, or four-wheel scraper manufactured for or sold by it to Harvester, would permit the use of the name "Heiliner," or any name of similar pronunciation regardless of spelling, by Harvester in connection with the manufacture or sale of any product covered by the agreement or a similar product, and was to place, in accordance with specifications furnished by Harvester, the name "International," or such other name (including the name "Heiliner" or any similar name) as Harvester may request, on each such product sold to Harvester under the agreement. Heil was not to permit others to use the name "Heiliner" in connection with the manufacture or sale of any product covered by this agreement, or a similar product. Heil, however, was not required to take any action to prevent others from using said name unless indemnified by Harvester against liabilities, expenses, and attorneys' fees it might have incurred in connection therewith. The petitioner sold its property interest in the name "Heiliner" to Harvester.

At any time within the period of 1 year following the termination of the agreement under subdivision 12 of the contract due to lapse of time or to notice given by either party, and upon Harvester's request, Heil was obligated to deliver to Harvester, engineering and manufacturing information (current as of the time delivery of the

information is made) relating to wagons, scrapers, and four-wheel scrapers, and was obligated to grant to Harvester a nonexclusive, royalty free license under all foreign and domestic patents, patent applications, and inventions which Heil owns and which relate to or are material to the manufacture or sale of wagons, scrapers, and four-wheel scrapers.

Prior to December 17, 1953, 3 to 5 years would have been required for Harvester to have designed, obtained production facilities, and experience for the manufacture of rubber-tired tractors. At that date it had no plans to do so for a period of at least 2 years. However, Harvester desired to be prepared to undertake the manufacture of two-wheel tractors similar in design to that used in the Heiliner unit should the demand for the product justify, in Harvester's judgment, the creation of production facilities for that purpose.

Harvester wanted to assure itself of a supply of two-wheel rubber-tired tractors during the period of the agreement or until such time as it was producing the tractors in sufficient quantity to satisfy its own requirements.

Since a two-wheel tractor with a two-wheel scraper or wagon had to be sold to a user as a unit, Harvester required two-wheel scrapers similar in design to those manufactured by Heil. Since Harvester had no plans at that time for the manufacture of two-wheel wagons and scrapers during the period that the contract was in existence and no other manufacturer manufactured scrapers or wagons that would go with the Heil tractors, Harvester desired to assure itself a source of supply of the wagons and the scrapers for use with the two-wheel tractor or for four-wheel tractors that either Harvester or Heil might develop.

Harvester also desired to offer for sale four-wheel scrapers similar to the two-wheel scrapers, and since Heil had designs for and was manufacturing four-wheel scrapers, Harvester wished to secure a source of supply of these four-wheel scrapers. A primary aim of Harvester in entering into the contract with petitioner was to obtain a source of supply of the scrapers, wagons, and tractors.

In the event Harvester would undertake to manufacture two-wheel tractors at some date in the future, the parties thought it would have been helpful to Harvester to have available the development and design work that had been done by Heil and to have had available Heil's manufacturing experience, which work and experience Heil was willing to make available "for the considerations set forth in the agreement."

The manufacture of the wagons and scrapers was an important part of Heil's business both before and after the signing of the agreement with Harvester. On or about July 15, 1959, pursuant to paragraph

4 *d* of the agreement, petitioner delivered to Harvester an executed nonexclusive license relating to the manufacture of scrapers and wagons. The license permits Harvester to manufacture, have manufactured for it, and sell the items covered by the patents held by Heil. Heil was not separately paid for the license.

Neither the license nor the basic agreement provided that Harvester would pay a royalty to Heil under the license. Harvester has not paid any royalty to Heil.

As required by paragraph 3 of the contract, Harvester, on or about December 17, 1953, paid $1 million to Heil.

As of December 17, 1953, the manufacturing cost of the Series 500 tractor plus integrated scraper was $17,987 and the manufacturing cost of the Series 800 tractor plus an integrated scraper was $22,381.

Just prior to entering into the contract with Harvester, Heil was selling the Series 500 unit (tractor plus scraper) for $21,140. The initial price set under the contract for the sale of the Series 500 to Harvester was $19,026. Just prior to entering into the contract with Harvester, Heil was selling the Series 800 (tractor plus scraper) for $25,160. The initial price set under the contract for the sale of the Series 800 to Harvester was $23,724.

On December 17, 1953, pursuant to the agreement, petitioner delivered to Harvester written assignments of all the patents held by it relating to the Heiliner tractors.

Harvester valued the patents transferred to it under the contract at $143,500 and carried them on its books at that value.

On or about January 14, 1954, pursuant to the agreement, petitioner delivered to Harvester complete bills of materials and reproducible tracings covering the Series 500 tractor and corresponding scraper, and the Series 800 tractor and corresponding scraper and wagon. Included in the drawings delivered were drawings covering items in the tractor that were purchased from others and assembled by Heil. The blueprints delivered disclosed whether the part referred to was manufactured by Heil and its part number. If the part referred to was manufactured by another manufacturer, this was shown on the blueprint together with the other manufacturer's part number.

Sometime after the contract was signed an "Operating and Maintenance Manual With Parts Catalog" covering the tractor, the scraper, and the wagon was to be delivered by petitioner to Harvester. The catalog outlines maintenance instructions for the user of the equipment and also contains a parts catalog to assist in identifying or ordering replacement parts. The catalog was given to all users of Heil tractors, and all purchasers of Heil tractors. It was on sale for $5 per copy. The parts catalog contained drawings identifying the parts, with lists identifying the parts and numbers thereof manu-

factured by Heil and the parts and numbers thereof manufactured by others.

Since Harvester had no intent for a period of time to manufacture the tractors or the wagons or scrapers, the blueprints, drawings, parts lists, and parts catalog were important to Harvester in 1953 and 1954 so that Harvester could engage in the purchase and maintenance of spare parts records and publication of parts manuals. The parts lists were converted into Harvester specifications for the purpose of providing a historical record.

One of the items covered by the patents assigned to Harvester by Heil was a "Power Control Unit," patent No. 2,321,905. Heil also manufactured other power control units for sale to companies besides Harvester. Heil did not hold a separate patent on these latter power control units. The power control units manufactured and sold to others besides Harvester were similar to the control unit sold to Harvester, and some of the features used in the patented power control unit were used in the power control unit sold to others. During the following years, Heil sold the following number of power control units, in the following dollar amounts to others besides Harvester:

| Year | Number | Dollar amount |
|---|---|---|
| 1954 | 112 | $101,158 |
| 1955 | 114 | 48,171 |
| 1956 | 101 | 74,076 |
| 1957 | 12 | 11,132 |
| 1958 | 5 | 4,810 |
| 1959 | 1 | 962 |
| Total | 345 | 240,309 |

ULTIMATE FINDINGS.

Harvester's primary aim in entering into the agreement with the petitioner was to get into the two-wheel rubber-tired tractor business immediately.

By entering into the agreement, Harvester would be able to accomplish its primary aim of getting into the rubber-tired equipment field immediately by securing an immediate and long-term source of supply of two-wheel rubber-tired tractors, and the necessary component scrapers and wagons.

OPINION.

Prior to December 17, 1953, Harvester was engaged in the business of manufacturing, among other things, earth-moving equipment which had become outdated and noncompetitive with that type of equipment sold by its competitors. It had a large well-developed worldwide distributorship system. It had not by that date designed

or equipped itself plantwise to manufacture heavy rubber-tired two-wheel earth-moving equipment which was the type then being sold by its competitors. On that date it would have required at the minimum at least 2 years for Harvester to properly so equip itself. Prior to December 17, 1953, Heil, the petitioner, was engaged in the manufacture and sale of heavy rubber-tired two-wheel earth-moving equipment which was up to date and competitive. It possessed patents covering various features of such equipment and maintained a design engineering staff for the improving and keeping competitive thereof. It had by that date acquired considerable valuable engineering and manufacturing information, or know-how, with respect to the manufacture of such equipment. It lacked a distributorship system of sufficient magnitude to compete saleswise with its competitors in the earth-moving equipment field, which competitors were much larger in all respects than petitioner. With this background Harvester decided to obtain a source of supply for competitive earth-moving equipment such as that manufactured by petitioner during the period which would elapse before Harvester would be able to acquire the patents, designs, inventions, and manufacturing know-how and equip its plant in order that it might itself manufacture such equipment. To that end and prior to December 17, 1953, Harvester approached petitioner, and extended negotiations took place between them, at arm's length, which led to the contract of that date which is before us.

The contract in paragraph 3 calls for the payment by Harvester to Heil of the sum of $1 million which, by the literal wording of that paragraph, the parties clearly intended to be the consideration for the transfer by Heil to Harvester of its then existing domestic and foreign patents on rubber-tired two-wheel earth-moving tractors, together with the necessary manufacturing know-how to produce the same. By its terms that paragraph also permits Heil on a royalty free basis to continue to manufacture such equipment and sell the same not only to Harvester but to others. As we construe that paragraph, aside from the purchase of the patents referred to, it is a purchase by Harvester of a commitment by petitioner to be a source of supply of rubber-tired two-wheel heavy earth-moving equipment during the period Harvester deemed to be necessary to enable it to equip itself, should it so desire, to manufacture such equipment.

Petitioner has in its income tax return for the fiscal year ended October 31, 1954, treated the $1 million payment as the sale price of capital assets and has reported a long-term capital gain thereon. Respondent in arriving at a deficiency has treated the $1 million payment as consideration for the sale of a capital asset only to the extent of $143,500 which he contends herein was the value of the patents actually transferred. The remaining $856,500 he has determined and

here contends represents an amount which has been received by petitioner for services rendered and to be rendered throughout the term of the contract. The respondent therefore determined and here contends that the latter amount represents ordinary income and is taxable accordingly.

After a careful review of the December 17, 1953, contract, we are unable to discover any provision therein which provides for services to be rendered by petitioner to Harvester or property to be transferred by petitioner to Harvester of an inventory nature which is by the terms of the contract uncompensated for. By a process of elimination, therefore, we conclude that the $1 million payment here involved was in consideration for the sale or exchange by petitioner to Harvester of capital assets and the right in Harvester upon the coming into existence of like assets in the future to have the ownership thereof promptly and immediately transferred to it by petitioner.

It is true that this record does not establish the fact that petitioner ever rendered the services called for in the contract or that it was ever paid therefor, but, in the present context, we do not deem this to be of significance. Such services were to be performed by Heil only at the option of Harvester. This is understandable in light of the circumstances which led Harvester to enter into the contract before us. At that time it could not be sure that entering into the manufacture and sale of heavy earth-moving equipment of the type covered by the patents acquired from petitioner would be a profitable operation for it to engage in. It had acquired a source of supply for such equipment at its option for a period of at least 5 years and if the arrangement became mutually profitable to the parties to the contract, they could at their own options proceed under the contract for a period of 11 years. In the meantime Harvester possessed the patent rights and a source of supply of manufacturing and engineering know-how and engineering assistance in the equipping of its plant if it desired to engage in the manufacture of such equipment itself. In addition to this, it had acquired the goodwill attached to the name "Heiliner" prior thereto used by petitioner in the sale of such equipment, together with petitioner's commitment to indemnify Harvester against any losses due to patent infringement or claimed patent infringement incidental to the manufacture thereof and together with petitioner's warranty as to workmanship and materials pertaining to any such equipment manufactured by it and sold to Harvester during the term of the contract. Both parties were gambling upon the profitable development of the market for the Heiliner earth-moving equipment here involved. The evidence adduced by respondent relative to the value of the patents actually transferred upon the execution of the contract fails in several respects to support respondent's $143,500

evaluation of the capital assets transferred and sold to Harvester under the contract. That evidence indicates that certain employees of Harvester without direction from the responsible officers of Harvester and particularly those who negotiated the contract in question, unilaterally and for the bookkeeping purposes of Harvester evaluated only such patents at that figure and treated the same as the cost of acquisition of capital assets and in its income tax return for 1953 expensed the remaining $856,500. Obviously this was a unilateral evaluation made for the tax advantage of Harvester alone and does not we think give a true picture of the fair market value of such patents. In any event the respondent was not justified in construing the contract to the effect that such patents in existence at the time of execution of the contract were the sole properties of a capital nature sold and exchanged thereunder. As we have indicated above, the contract provides also for the transfer by Heil to Harvester of all such property coming into existence in the future together with manufacturing information, or know-how, pertinent thereto. We are not therefore disposed to interfere with the parties' own evaluation of the property and property rights transferred by petitioner to Harvester under the contract.

Respondent takes the position that although the patents transferred under paragraph 3 of the contract may have been capital assets held for more than 6 months, the engineering and manufacturing know-how was not such an asset, is not shown to have been held for more than 6 months, in effect merely constituted services rendered, and was not sold. We cannot agree.

Concededly the patents here involved were long-term capital assets and were sold. The contract under which they were transferred by way of sale likewise provided for the transfer of the engineering and manufacturing information, or know-how, pertinent and necessary to the successful manufacture of products under the patents. In such situation the information, or know-how, was an incident of the patents, took on the nature of such property, and constituted a long-term capital asset that also was sold.

*Decision will be entered for the petitioner.*