Raymond M. Hessert v. Commissioner.
Hessert v. Commissioner
Docket No. 10598.
United States Tax Court
1947 Tax Ct. Memo LEXIS 42; 6 T.C.M. (CCH) 1190; T.C.M. (RIA) 47301; October 31, 1947
Robert Ash, Esq., 545 Munsey Bldg., Washington, D.C., and John Y. Merrell, Esq., for the petitioner. Neil D. McCarthy, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1943 in the amount of $1,609.34. The adjustments reflected in the deficiency notice giving rise to the deficiency are not here in controversy. Petitioner here claims that certain payments received by him during 1942 and 1943 from Remington Rand, Inc., constituted proceeds from the sale of capital assets held by him more than six months. Petitioner's original returns for these years treated these payments as ordinary income in the form of rent and royalties. On the basis of this claim petitioner seeks a refund for the year 1943 *43 in the amount of $1,694.92. Due to the forgiveness feature applicable to the years 1942 and 1943 the deficiency determined by respondent and the refund claimed by petitioner pertain to the latter year. The question is whether certain payments received by petitioner from Remington Rand during 1942 and 1943 constitute capital gain or ordinary income. Petitioner's return for 1942 was filed with the collector of internal revenue for the first district of New Jersey. Petitioner's return for 1943 was filed with the collector for the 28th district of New York. Findings of Fact Petitioner is an individual residing in Larchmont, New York. During or prior to 1930 petitioner applied to the United States Patent Office for three patents relating to photographing, endorsing and perforating machines for checks and similar business paper. During December 1933 these applications were granted. Prior to 1937 petitioner never assigned or transferred these patents. On July 28, 1937, petitioner entered into a written contract with Remington Rand. This contract is in evidence herein as Exhibit 6. By reference all the recitals and provisions of the contract are made a part of our findings of fact. *44 This contract contains the following recitals and provisions, among others: "WHEREAS Hessert is skilled and experienced in the building, selling and servicing of photographic devises which handle, convey and photograph business documents in rapid succession on photographic film made of celluloid, or similar material in strips or rolls preferably of 16mm. width, and is skilled in the selling and servicing of consumable supplies used therewith, including film, and whereas Hessert has done certain sales development work which has created actual and potential market for such devices and consumable supplies therefor, including film, and "WHEREAS Hessert represents that he is the owner of inventions in the photographic field as more fully described in the following United States Letters Patent No. 1,939,446, dated December 12, 1933, No. 1,941,003, dated December 26, 1933, and No. 1,941,004, dated December 26, 1933, and patent application Serial No. 76,905, filed April 29, 1936, and whereas Hessert represents that he has a non-exclusive license under United States Patent No. 1,614,619, known as the Kaplan patent, and whereas Hessert represents that he has the full and exclusive right *45 to grant licenses or to sell and dispose of the inventions comprehended in said Letters Patent and patent application, and the patent or patents which may be granted upon said application and the right to grant a sublicense under the said Kaplan patent United States, No. 1,614,619, and that said inventions and said Letters Patent and patent application are free and clear of any liens or incumbrances and whereas machines covered by some of said Letters Patent or said patent application have actually been built and are being operated by commercial houses which have purchased the same, and are doing the required work satisfactorily, and * * *
"WHEREAS, The Company desires to acquire the exclusive right, privilege and license to manufacture, vend, rent or otherwise dispose of or put to use the said inventions comprehended in the enumerated Letters Patent or said application now pending, together with its or their parts, appliances and appurtenances throughout the United States of America and its territories and dependencies and in such other countries where corresponding patents have been obtained by Hessert, for the uses and purposes hereinafter described and more fully set forth, *46 which license the inventor is willing to grant upon the terms, covenants and conditions herein contained; "NOW THEREFORE, in consideration of the premises and of the covenants, representations, promises and agreements herein contained the parties hereby mutually agree as follows: "FIRST: That the Company will pay to the inventory Twenty-Five Thousand ($25,000) Dollars at the time of the execution by the inventor of this agreement. "SECOND: The inventor agrees to assist The Company by counsel, advice, consultation and other like ways in familiarizing the Company with the problems and methods of handling this particular type of business, including the building, selling, servicing and supplying consumable supplies including film for the said devices for handling, conveying and photographing business documents in rapid succession on photographic film to the end that The Company may be able to build or have built for its use, sale, service and supply consumable supplies including film, for said devices in the largest quantity possible in the shortest period of time consistent with sound business methods. "THIRD: Hessert agrees to, and does hereby grant to The Company the sole and *47 exclusive right to operate, make, use, sell, rent and put to account the various devices under the said inventions as embodied in the said enumerated Letters Patent and patent application, and any or all patents issuing thereon, or any reissues, divisions, renewals, continuations or extensions of any of said patents or application, or patents issuing on said application and a non-exclusive sublicense under United States Patent No. 1,614,619, and all further inventions made by Hessert during the life of this agreement as herein provided solely and basically usable in connection with or substitution of inventions licensed hereunder, and to use and employ said inventions whether covered by said patents or any patent issuing on said application or further application for patent on further inventions as referred to in this paragraph, during and to the end of the full term of any of said Letters Patent and said future patents on said further inventions; said exclusive right of this paragraph shall extend to all renewals, divisions and extensions of said Letters Patent or said future Letters Patent on said further inventions in every part of the United States, its territories and dependencies, *48 and other countries in which patents have been obtained by Hessert. * * *
"FIFTH: It is the intent of Paragraphs 2 and 4 hereof that The Company and Hessert shall prosecute with all due diligence consistent with sound business methods, this particular business to the intent that the greatest number possible of said machines shall be disposed of and put in use in the shortest length of time possible, and that the greatest quantity of consumable supplies, including photographic film, shall be supplied for said machines in the shortest length of time possible. "SIXTH: Any inventions or improvements or discoveries solely and basically usable in connection with or in substitution of the inventions licensed hereunder, and which may be made or discovered by employees of The Company, or which may be acquired by The Company shall be made available to The Company for operations within the scope of this contract; in the case of such said improvements made by employees of The Company which in the mutual opinion of The Company and Hessert shall be patentable, then in that event the Company shall take such steps as may be deemed necessary and as its counsel may advise to procure United *49 States Letters Patent upon said such improvements, and will cause said such Letters Patent to be issued and/or assigned and transferred to Hessert, and The Company shall pay the cost thereof, including the governmental or Patent Office charges; Hessert agrees to retain title thereto during the full term of this agreement, except as otherwise provided in this agreement, and shall grant to The Company the exclusive license under said such patents, except as otherwise provided in this agreement; as to inventions or patents acquired by The Company from others than its employees, no assignment of the title to said such inventions shall be made to Hessert except in the event that, in accordance with the provisions of this contract, the business carried on by The Company within the scope of this agreement shall be returned to Hessert, in which event the Company agrees to grant unto Hessert, a non-exclusive license to manufacture, use and sell products covered by such inventions acquired from other than its employees during the term of this agreement. None of the provisions of this paragraph shall apply after December 26, 1950, if Hessert has been paid by The Company under this agreement a *50 minimum of Three Hundred and Seventy Five Thousand ($375,000.00) Dollars in payments hereunder, exclusive of the Twenty-five Thousand ($25,000.00) Dollars initial payment, and any salaries paid under a separate employment contract with The Company. "SEVENTH: The Company agrees to cause the patent notice required by law to be placed on all devices it makes, sells or rents, and agrees to include in such patent notice the numbers of all patents specifically enumerated herein, those The Company acquires from its employees, those it acquires from others than its employees, and those which issue on the application of Hessert, where the same cover the devices which are being made, sold or rented; such patent notice shall also include the number and date of United States Kaplan patent, No. 1,614,619, issued January 18, 1927, where the same covers the devices made sold or rented by The Company. * * *
"NINTH: Hessert and The Company hereby covenant and agree that they will in all reasonable ways cooperate in protecting the rights hereby granted, and that to that end, in case any action or actions of infringement are brought against The Company in the manufacture and sale of any of the *51 products manufactured, sold or rented under the inventions and devices covered by the said Letters Patent and said patent application aforesaid, they will cooperate in the defense of such litigation, and The Company shall defend such action or actions by counsel of its own choosing, the litigation expense thereof, not including any possible accounting or judgment, shall be borne by Hessert and The Company in the relation of twenty (20) per cent by Hessert, and eighty (80) per cent by The Company, * * * "TENTH: The Company shall pay to Hessert six (6) per cent of the gross rental or gross sale price received from machines contemplated by this agreement, minus any trade discounts actually given, and three and one-half (3 1/2) per cent of the gross sale price of consumable supplies, including film, minus any trade discounts actually given, such payments by The Company shall continue to be made on business actually done until December 26, 1950, regardless of the total amount thereof, which accrues from the date of the execution of this contract, provided that the inventor has received Three Hundred and Seventy-Five Thousand ($375,000.00) Dollars or more in payments under this paragraph, *52 exclusive of the initial Twenty Five Thousand ($25,000.00) Dollar payment, and payments under employment contracts; however, if Hessert has not received the Three Hundred and Seventy-Five Thousand ($375,000.00) Dollars, as aforesaid in this paragraph, The Company agrees to continue payments to the inventor at the same rate set forth in this paragraph, until he has received Three Hundred and Seventy Five Thousand ($375,000.00) Dollars under this paragraph, exclusive of the Twenty Five Thousand ($25,000.00) Dollars initial payment, and any amounts received under employment contracts. If during the life of this contract the payments to Hessert by The Company for payments under employment contracts, payments under paragraph SEVENTEENTH following, and payments as aforesaid in this paragraph, exclusive of the Twenty Five Thousand ($25,000.00) Dollars initial payment shall not equal the following amounts for the years enumerated, and The Company does not pay an amount to Hessert equal to the amounts below enumerated, then Hessert may bring this contract to an end in accordance with other provisions hereof. "It is acknowledged by the parties to this contract that it is not the intention *53 of either party to work a hardship upon the other by the establishing of minimum payments, but such minimum payments are established purely for the purpose of assuring vigorous prosecution of the business covered hereunder, and to that end it is agreed by Hessert that any amounts in any year, paid to Hessert over and above, as below enumerated, may be accumulated by The Company and used and applied as a credit in any subsequent year. Year After Execution
Minimum
of Contract
Payment
3rd year
$15,000.00
4th year
20,000.00
5th year
25,000.00
6th year, and each remaining
year under this contract
25,000.00
"The Company's fiscal year begins on April 1st of each year, and ends on March 31st of each year. Payments made hereunder shall be payable to Hessert quarterly as of July, October, January and April 1st, for accruals coming due during the respective preceding periods. * * *
"TWELFTH: In case The Company shall fail to carry out any of the covenants or agreements herein made by it, and breaches any covenant or agreement of this contract, and does not remedy said breach or breaches within ninety (90) days after written notice thereof is served upon The *54 Company by Hessert, or in case a voluntary petition of bankruptcy is filed by The Company, or in case it is adjudicated bankrupt upon an involuntary petition of bankruptcy, or in case it makes an assignment for the benefit of creditors, or in case it is placed in the hands of a receiver who is not discharged within six (6) months after his said appointment, Hessert shall have the right upon thirty (30) days written notice to terminate this contract, and The Company thereupon forfeits all previous payments made under this contract or employment contracts and the business contemplated by this contract shall be transferred and assigned to Hessert in accordance with other provisions hereof, and free of all liens, incumbrances or claims of creditors. "THIRTEENTH: The Company shall have a right to terminate this contract under the following conditions: "It shall serve upon Hessert a written notice of its desire to terminate the contract, and ninety (90) days thereafter said termination shall become effective, but such termination shall not relieve The Company of payment of sums accruing and becoming due to Hessert from the Company prior to the time such termination takes effect, and *55 such termination shall not free The Company of other provisions hereof, as set forth in paragraph FOURTEENTH hereof. "FOURTEENTH: If this contract is terminated by Hessert in accordance with the provisions of paragraph TWELFTH, or is terminated by The Company in accordance with the provisions of paragraph THIRTEENTH, then the following provisions shall apply: "The Company agrees to go out of the business covered by this contract, including the supplying of machines and/or consumable supplies, including film, contemplated hereunder, for a period of three (3) years, and agrees to assign to Hessert the business conducted hereunder, including trade-marks and good will of the business conducted hereunder, and further agrees for a period of three (3) years to refer customers or those inquiring about the machines or supplies, including film contemplated hereunder, and forward all orders for the machines and consumable supplies, including film, to Hessert or a company of his designation which he shall communicate in writing to The Company, the party of the first part herein; further if this contract is terminated, as above stated in this paragraph, The Company shall notify all its customers *56 of machines or consumable supplies, including film, that Hessert, or a company of his designation, will carry on the business of The Company, the party of the first part, from that time forward; if, after three (3) years The Company decides to resume the business of furnishing consumable supplies, including film, for use by the machines contemplated hereunder, then The Company agrees that the provisions of paragraph TENTH hereof with regard to the sale of consumable supplies, including film, shall become binding on The Company, and that it shall make such payments as required by the provisions of said paragraph TENTH until total payments under this agreement equal the sum of Three Hundred Seventy Five Thousand ($375,000.00) Dollars as above provided. * * *
"EIGHTEENTH: Hessert agrees to pay the royalties required by Kaplan under Kaplan United States Patent No. 1,614,619, issued January 18, 1927 and in the event of his failure to do so, the Company may pay same and deduct such amount from payments to be made to Hessert. * * *
"TWENTY-SECOND: This agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, successors *57 and assigns, except that if The Company assigns this contract, then it shall pay immediately to Hessert the sum of Three Hundred Seventy Five Thousand ($375,000.00) Dollars, minus such payments as The Company has made theretofore under the provisions of paragraph TENTH hereof; salaries and initial payment of Twenty Five Thousand ($25,000) Dollars shall not be deducted from the Three Hundred Seventy Five Thousand ($375,000) Dollar figure of this paragraph; such assignment shall, however, not relieve The Company's assignee of other applicable provisions of this contract, except as to the payment of the minimum sum of Three Hundred Seventy Five Thousand ($375,000) Dollars under paragraph TENTH hereof; if such assignment is made before December 26, 1950, then Hessert shall be entitled to receive from the Company's assignee payments in accordance with the provisions of paragraph TENTH hereof, until said date December 26, 1950." * * *
The exclusive right thus granted referred to the three patents mentioned in the recitals above quoted from the contract. The non-exclusive sublicense related to a patent known as the Kaplan patent which also involved the type of machine covered by petitioner's *58 patents. Petitioner had an arrangement with Kaplan by which petitioner could grant a non-exclusive sublicense to the Kaplan patent. Petitioner agreed to pay Kaplan 2 1/2 per cent of the sales price of machines manufactured by Remington Rand under the Kaplan patent. Under this agreement petitioner received from Remington Rand $4,009.45 in 1942 and $8,544.82 in 1943. Out of the $4,009.45 received in 1942 petitioner paid Kaplan $548.68 and therefore reported the amount of $3,460.77 as royalty. Out of the $8,544.82 received by petitioner in 1943 he paid Kaplan $2,582.42 and reported $5,962.40 as royalty. Petitioner now claims these amounts should have been reported as long-term capital gains rather than as ordinary income. During 1942 and 1943 petitioner was sales manager for Remington Rand and as such was in charge of selling machines covered by the agreement. As sales manager he received a salary of approximately $9,000 a year during 1942 and 1943. For many years prior to 1937 petitioner had been engaged in the business of developing, manufacturing and selling machines for perforating and filming checks and similar business paper. In 1920 petitioner started this business as a sole *59 proprietor under the name of "National Perforator Company," hereinafter referred to as the Company. In 1923 the Company was constituted a partnership. Petitioner had an 80 per cent interest and a John A. Quinn had a 20 per cent interest in this partnership. Quinn furnished financial backing but did not otherwise take any active part in the conduct of the business. In 1929 the partnership was transformed into a corporation of which Quinn held 10 shares of stock, Klimcheck held 1 share and petitioner held 39 shares. Until 1937 the Company manufactured or caused to be manufactured about 20 perforating machines. These were manufactured in 1929 and in 1935 and 1936. For the latter two years the machines were manufactured by outsiders for the Company. During the intervening years of 1930 to 1935, the Company was engaged in litigation. A subsidiary of Eastman Kodak, Recordak, brought suit against the Company for infringement. The Company won the litigation. The decisions are reported at 5 Fed. Supp. 210, and 76 Fed. (2d) 600. Substantial legal fees were incurred in this connection. Petitioner never assigned his patent applications or his patents to the Company *60 or to anyone else prior to 1937 when he entered into the agreement with Remington Rand. The Company was permitted to manufacture machines covered by the patents held by petitioner. Petitioner never received any royalty or other similar payments for this permission. Petitioner did receive a salary from the Company which was controlled by him and which he operated. Despite the fact that petitioner never assigned any patent applications or patents to the Company, they were reported as assets of the Company on the Company's income tax returns and were valued at $25,000. The Company's minute book under the date of May 1, 1929, lists as assets acquired from the partnership applications and patents valued at $25,000. Opinion Respondent contends that the amounts received by petitioner from Remington Rand must be treated for income tax purposes as ordinary income. Respondent argues that the agreement between petitioner and Remington Rand was essentially one for petitioner's personal services and that therefore the amounts received by petitioner under the agreement were, at least in part, compensation for such services. Respondent further argues that the patents allegedly sold by petitioner *61 were not capital assets because they were property used by petitioner in his trade or business and subject to depreciation and, further, that if they were capital assets they had not been held for six months by petitioner. We have concluded with certain exceptions to be noted that the amounts in controversy should be treated as long-term capital gain as petitioner contends and not as ordinary income. The agreement between petitioner and Remington Rand does contain elements which tend to support respondent's contention that it represents a contract for personal services at least in part. Respondent argues that since no basis has been furnished on which to allocate the amounts received by petitioner as between personal services and consideration for the patents that the entire amounts received must be treated as ordinary income. We have carefully studied the agreement and have concluded that although it does involve elements of personal services it nonetheless essentially constitutes a sale by petitioner of his patents. Such personal services as are contemplated by the agreement strike us as ancillary and subsidiary to the sale of the patents. The services called for are of an advisory *62 nature not unusually involved in the sale of a highly technical and intricate device. Such services as petitioner rendered to Remington Rand which could be considered as constituting something more than those abetting the sale were, in our opinion, the subject of a separate contract of employment under which petitioner received a salary and were thus segregated and distinct from the sale agreement. The fact that the minimum payment was geared to a percentage of sales does not, in our opinion, convert what we consider essentially a sale agreement into a contract for personal services. It is not an uncommon business practice to establish a sales price in terms of a percentage of profits to be derived from the commodity sold. That such a price formula undoubtedly creates an incentive in the seller to cooperate in rendering the thing sold a profitable venture does not constitute the arrangement, in our view, a contract for personal services rather than a sale. Respondent suggests that at least the percentage of gross sale price received by petitioner from the sale of consumable items, such as film, can not be considered as capital gain. But this view, in our opinion, misconceives the nature *63 of the agreement. In our view petitioner, by the agreement, accepted a minimum price of $400,000 for his patents. Of this amount $25,000 was paid on execution of the agreement. The remaining $375,000 was to be paid from a percentage of the gross rental or gross sale price. The fact that the source of the payment was in part to be derived from the sale of film does not change the character of the price paid for the patents into something else. If the $400,000 represents the agreed minimum price for the patents, and we think it was, then the origin of the purchase money does not affect the character of that amount as the selling price. On the authority of Edward C. Myers, 6 T.C. 258, we think the present agreement constituted a sale and not a license. Nor does the possibility of ownership in the patents reverting to petitioner on termination of the agreement affect this conclusion as this possibility takes the form of conditions subsequent. See Edward C. Myers, supra.Since we disagree with respondent with respect to the personal service aspect of the agreement we have concluded and hold that the agreement in question constituted a sale by petitioner of his *64 patents. However, the agreement also includes a sublicense on the Kaplan patent. Petitioner agreed to pay Kaplan 2 1/2 per cent of the sales price of the machines manufactured by Remington Rand under the Kaplan patent. Petitioner paid Kaplan $548.68 in 1942 and $2,582.42 in 1943. Therefore, the total sales of machines manufactured by Remington Rand under the Kaplan patent for 1942 and 1943 must have amounted to $21,947.20 and $103,296.80, respectively. Since petitioner was to receive 6 per cent of these amounts, he must have received $1,316.83 and $6,197.81, respectively. These amounts, less the amounts paid by petitioner to Kaplan, must be treated as ordinary income because these amounts represent payments under a sublicense and not the proceeds of a sale. Respondent's contention that petitioner's patents are not capital assets because they constituted property used in petitioner's trade or business of a character subject to depreciation is unavailing. Even assuming that the patents could be properly so designated, section 117 (j) of the Internal Revenue Code, which is applicable to the years involved here, accord capital gain treatment to the gain on their *65 sale. Respondent's contention that petitioner did not hold the patents for six months prior to the sale is, in our opinion, unjustified. Respondent argues that the Company and not petitioner held the patents prior to their sale. Despite the fact that the patents were carried as assets on the Company's balance sheets as shown on its income tax returns and also appeared as such in the Company's minute book, the fact remains that petitioner never transferred or assigned in any way his patents prior to his agreement with Remington Rand. Under these circumstances it is inescapable that the petitioner held the patents. We therefore conclude and hold that with the exception of the amounts received on account of the sublicense on the Kaplan patent above noted the amounts received by petitioner in 1942 and 1943 under the agreement with Remington Rand constituted part of the sales price for patents held by petitioner for more than six months and, as such and by virtue of section 117, must be treated for income tax purposes as long-term capital gain. Decision will be entered under Rule 50.