HOWARD S. GABLE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gable v. Commissioner
Docket No. 2715-72.
United States Tax Court
T.C. Memo 1974-312; 1974 Tax Ct. Memo LEXIS 5; 33 T.C.M. (CCH) 1427; T.C.M. (RIA) 740312; December 18, 1974, Filed. Howard S. Gable, pro se. Joe K. Gordon, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT *6 AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency
1966
$ 8,400.57
1967
18,761.65
1968
32,185.61
1969
41,038.18
Petitioner asserts an overpayment for the year 1969. Because of concessions by the parties, the sole issue remaining for decision is whether the amount of $40,000 received by petitioner in 1969 constituted compensation for services or payment in exchange for patent rights or an option to acquire such rights. FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioner resided in Kansas City, Missouri, at the time the petition was filed. His Federal income tax return and amended return and a second amended return were filed with the Internal Revenue Service Center at Kansas City, Missouri. In 1959, petitioner became interested in water soluable compounds having magnetic properties. He began investigating them in that year and in 1965 applied for a patent covering the invention of such compounds, as well as processes for their *7 production. No patent has yet been issued with respect to this application. In 1969, petitioner approached Chemetron Corporation (Chemetron) with a view to interesting it in his invention. On July 11, 1969, Chemetron and petitioner executed a "Secrecy Agreement," reciting, in pertinent part, as follows: WHEREAS, Gable has developed a class of organo-iron compounds which exhibits the quality of being strongly attracted by a magnetic field and some members of which class are soluble in water and in certain other solvents and which maintain these magnetic properties while in solution together with processes for producing the same, and has certain know-how relating thereto, and owns application for Letters Patent of the United States S/N 487,565 relating to the same; and WHEREAS, Chemetron is desirous of possibly obtaining rights thereunder on a mutually acceptable basis; and WHEREAS, Gable is willing to disclose and make available to Chemetron a copy of said application for Letters Patent, together with the prosectuion in the file wrapper of said application, as of the date of this agreement, to enable Chemetron to determine whether they in fact desire to obtain rights thereunder, *8 provided that Chemetron is willing to observe certain precautions regarding the disclosure of certain information to others and their use of the same. NOW, THEREFORE, in consideration of the mutual covenants and obligations assumed by the parties, it is agreed as follows: 1. Gable agrees to furnish Chemetron, upon execution of this agreement, a copy of the file wrapper and contents of Gable et al. application, S/N 487,565 entitled "Organo-Iron Compounds." 2. Chemetron agrees at all times: (a) Not to disclose to others at any time the information furnished pursuant hereto by Gable, except such information as may be or becomes published generally and properly available to others; (b) Not to use any of the information furnished pursuant hereto by Gable without his consent in writing, except such information as was published or is or becomes generally and properly available to others; or known to Chemetron as a matter of record prior to this agreement; or made available to Chemetron by a third party who has not derived it as a matter of right from Gable. (c) That all information and data disclosed by Gable to Chemetron not excepted under paragraphs 2(a) and 2(b) herein *9 shall remain Gable's sole and exclusive property and shall be maintained by Chemetron in a safe place and treated with the same degree of care that Chemetron would treat its own confidential material and shall not be copied or duplicated without Gable's written consent. Chemetron agrees promptly to identify the persons authorized to review the information disclosed by Gable. All material containing or prepared by use of any of the disclosures received from Gable shall be marked "confidential." (d) That if Chemetron decides not to obtain any rights hereunder, or when requested by Gable, Chemetron will return everything received from Gable, together with all material prepared by Chemetron therefrom, or by use thereof, without making or retaining copies thereunder, or extracts therefrom unless authorized by written agreement. (e) The obligations of this paragraph 2 shall extend for a period of seven years, unless terminated earlier as herein provided or by the mutual consent of the parties hereto. Chemetron did develop an interest, and it and petitioner entered into a series of negotiations. Chemetron ultimately agreed to acquire an option to purchase petitioner's rights *10 in his invention and to supply the funding necessary for a program of further research and development designed to make the invention commercially marketable. This second agreement between Chemetron and petitioner contained the following pertinent provisions: WHEREAS, Gable represents that he (together with others in his employ) has researched and made inventions in water-soluable compounds having magnetic properties and processes for production of said compounds, and has developed technical information with respect to said compounds; and WHEREAS, Gable has applied for U.S. Letters Patent Serial No. 487,565, filed September 15, 1965, claiming at least some of said inventions, compounds and processes for production thereof; and proposes to file more applications for Letters Patent on these inventions and improvements thereon; and WHEREAS, Gable represents that he is the owner of the entire and unencumbered right, title and interest in and to the aforesaid inventions in water-soluble compounds, processes for production of said compounds, and application for U.S. Letters Patent Serial No. 487,565, filed September 15, 1965, and the aforesaid improvements; and WHEREAS, Chemetron *11 is willing to advance certain funds for certain further investigation of said compounds deemed necessary by Chemetron and Gable prior to commercialization of said inventions and improvements; and WHEREAS, Chemetron desires to obtain an exclusive license from Gable under said inventions, compounds, processes for their production, uses thereof, improvements thereon, technical information, and patent application, any patents resulting therefrom and any patents resulting from applications on improvements thereon, for the purpose of commercial exploitation by Chemetron in a suitable and orderly manner; NOW, THEREFORE, the parties hereto mutually agree as follows: 1. For the purpose of this agreement, the following terms shall have the meanings specified below: "Development" shall mean technical information, inventions and discoveries of Gable and parties in privy with him relating to water-soluble compounds having high ferromagnetic properties capable of remaining in the solution, together with processes for production of such compounds, and uses and applications thereof, and improvements thereon and thereto. * * * "Patent Rights" shall mean application for U.S. Letters Patent *12 Serial No. 487,565, filed September 15, 1965 and any patents resulting therefrom and/or relying for entire or partial priority thereon, including corresponding foreign patent applications and patents resulting therefrom, and any currently pending or future patent applications, any and all patents resulting therefrom or related thereto, both U.S. and foreign, related to Development including improvements thereto. "Licensed Items" shall mean compounds and any component materials and apparatus especially made or especially adapted for use with such compounds and not staple articles or commodities of commerce suitable for substantial unrelated use, made, used or sold covered by one or more valid and non-expired claims of the Patent Rights. "Valid Claims" shall mean those claims in an unexpired patent or patents of the Patent Rights as to which there has been no ruling of invalidity by a court of competent jurisdiction not appealed or not appealable. 2. Chemetron argues to provide funds in the amount of One Hundred Thousand Dollars ($100,000.00) for a period of one (1) year from the commencement of the program for research and development set forth in Exhibit A attached and made *13 a part hereof by this specific reference, and in accordance with written directions and program provided by Gable from time to time, and consented to by Chemetron, which consent will not be unreasonably withheld. As Gable has indicated that he could not devote full time to item "II Howard S. Gable" of Exhibit A, made a part hereof, and as the contributions of the other individuals named thereunder and the extent of travel and quantities of supplies are unknown, Chemetron has established its fund commitment for item "II" as an 80% program to be carried out within said one (1) year at a cost to Chemetron of Sixty Five Thousand Dollars ($65,000.00). 3. From the date of this Option Agreement until thirteen (13) months following the institution of item "I" of Exhibit A, Gable hereby irrevocably grants to Chemetron and Chemetron accepts the option to acquire as of the date the option is exercised the exclusive license and right to and under the Development and Patent Rights in the form attached and marked "Exhibit B" and made a part hereof by this specific reference. 4. (A) Gable agrees to continue to devote 80% of his time and cause his associates named in item "II" of Exhibit *14 A to devote similarly proportionate amounts of their time in the exercise of their best efforts with due diligence in carrying out further work, development and experiments to solve technical problems relating to Development for a period of one (1) year from the date hereof on the terms specified in items "II" and "III" of the attached Exhibit A. (B) Gable agrees to furnish or cause to be furnished to Chemetron written progress reports at least monthly with respect to activities pursuant to Exhibit A. In addition to the written reports, Gable shall consult exclusively with Chemetron concerning Patent Rights and Development throughout the term of this agreement, and to answer [sic ] to the best of his ability any and all inquiries of Chemetron concerning Patent Rights and Development. Chemetron shall have access by its nominees at all times to any and all personnel and activities carried out with respect to Patent Rights and Development, whether by Gable, his employees, associates, attorneys, or independent contractors such as Stanford Research Institute and its employees, and to any and all reports and documents relating thereto. (C) In the event Chemetron, during the period *15 of Paragraph 3 hereof, elects neither to terminate this agreement nor to exercise its said option, Gable and Chemetron agree to determine and in good faith to extend the "Program for Research and Development" pursuant to Exhibit A and/or add or substitute new programs of investigation within the scope of this agreement on mutually agreeable terms for additional six month periods, not to exceed in number two (2) such additional six months periods, within thirty (30) days after any one of which additional six month periods Chemetron may elect to exercise its option herein granted to acquire the license pursuant to Exhibit B or to terminate this agreement. (D) Upon termination of this agreement by Chemetron, any and all results of the work undertaken (a) pursuant to the program of Exhibit A hereof and any six-month extensions thereof, and (b) by Chemetron on Development, shall become the property of Gable. * * * Exhibit A
PROGRAM FOR RESEARCH AND DEVELOPMENT
October 1, 1969 - September 30, 1970
I. Stanford Research Institute
$30,000.00
Investigations related to fundamental properties; Electrical, magnetic, ultra-centrifuge studies
II. Howard S. Gable
65,000.00
Howard S. Gable
Glenn W. Kerr
F. Lowell Taylor
Stenographic
Travel
Laboratory supplies
Activities
A. Preparation of materials for use at SRI
B. Broadening of base of fundamental knowledge of magnetic materials
1. Synthetic ferrite combinations
2. Substitution of other organic structures for protein products
3. Fractionation of mixtures to separate pure compounds.
C. Coordination of general program Gable and Chemetron
III. Develop cooperative relationships with outside groups who are specially qualified to progress special areas of activity
Cost limited to contact efforts - not to exceed $2,500.00
A. Bowles Engineering Co.
Applications in fluidics
B. Clark Johnson
1. Some electrical applications
2. Electromagnetic printing
C. Stanford Research Institute
Area to be determined
IV. Patent Costs
As billed, not to exceed
2,500.00
$100,000.00
*16 A copy of the License Agreement later entered into by the parties was attached to the Option Agreement (hereinafter sometimes referred to as the Option) as Exhibit B at the time the latter was signed. Both documents were drafted by Chemetron's patent counsel. The Option was formally executed on October 1, 1969, although the parties had approved its terms somewhat earlier. On August 29, 1969, in anticipation of the agreement, Chemetron loaned petitioner $20,000 on a note due 31 days after date. This amount was subsequently applied against Chemetron's obligation under the Option and the note was cancelled on October 1, 1969. On October 22, 1969, Chemetron made a further payment of $20,000. These two payments, aggregating $40,000, represent the entire amount received by petitioner in 1969 under the Option. The balance was paid in 1970. On September 1, 1970, Chemetron notified petitioner that it was exercising its option to acquire his invention, and a License Agreement (hereinafter sometimes referred to as the License) was executed between them on September 15, 1970. The License contained substantially the same recitations and definitions as the Option; the pertinent provisions *17 are as follows: 2. Gable hereby grants to Chemetron and Chemetron accepts the sole and exclusive right and license throughout the world together with the right to grant sublicenses, to make, have made, use and sell subject matter of the Development and Licensed Items covered by Valid Claims of the Patent Rights. * * * 6. Concurrently with the rendering of statements * * * Chemetron will pay to Gable royalties pursuant to the scale of percentages of the actual sales price received by Chemetron or its sublicensees, as the case may be, for all Licensed Items made, used or sold during such preceding calendar quarterly period in accordance with the following schedule: (a) Schedule of Running Royalties United States and Canada 3% until such time as one or more United States Letters Patent covering Licensed Items under allowed claims shall have issued; and thereafter 5% for a period of ten (10) years; and thereafter, 4% for a period of five (5) years; and thereafter, 3% until the expiration of the last to expire patent of the Patent Rights, on a country by country basis. (b) Schedule of Running Royalties Countries Outside the United States and Canada One-half (1/2) of *18 the percentages scheduled in paragraph (a) above. (c) Running Royalties from Sublicensees (Other than sublicensees owned or controlled by, or owning or controlling, or owned or controlled by a sublicensee owning or controlling Chemetron, to the extent of at least 51% of the stock entitled to vote for directors thereof) Fifty percent (50%) of royalties pursuant to subparagraphs (a) and (b) of this clause 6 received from sublicensees. * * * Any and all sums of monies advanced for programs pursuant to Exhibit A hereof shall be deductible from royalties due and owing hereunder but never in amounts that would reduce amounts of royalties otherwise payable to Gable in one year by more than twenty-five percent (25%). Chemetron agrees to pay Gable a minimum royalty hereunder of Fifteen Thousand Dollars ($15,000.00) commencing one year after the date of this agreement, Twenty-Five Thousand Dollars ($25,000.00) commencing two years after the date of this agreement, and yearly thereafter as long as this agreement is in full force and effect. The minimum royalties shall be paid yearly in advance, commencing with the first time on the one-year anniversary of the date of this agreement. *19 Said minimum royalties paid to Gable shall be credited against running royalties due to Gable pursuant to the schedules thereof above. Petitioner received only minimum royalties under the License. Consequently, no part of these payments under the Option has ever been credited or otherwise repaid. If Chemetron had failed to exercise its option under the 1969 agreement, petitioner would not have been required to repay any of the amounts received thereunder. ULTIMATE FINDINGS OF FACT The $40,000 received by petitioner from Chemetron in 1969 constituted payment for the transfer of patent rights and not compensation for services. OPINION Petitioner reported the $40,000 received under the Option in 1969 as ordinary income. By an amendment to his petition, he now claims that these payments were in exchange for the transfer of patent rights and should be treated as capital gain under section 1235. [1] Respondent contends that these amounts were compensation for services and therefore properly reported as ordinary income; otherwise he concedes that section 1235 applies. Cf. Rev. Rul. 57-40, 1957-1 C.B. 226. *20 The difficulty in resolving the purely factual issue thus presented (see William Tiffin Downs, 49 T.C. 533, 538 (1968)) stems from the nature of an invention and a recognition that it is to a large degree no more than the embodiment of the inventor's inspiration and labor so that the payments an inventor receives are, at least in part, inevitably in recompense for his "services." Indeed, respondent's own regulations take into account the dual characteristics of payments in respect of inventions. Thus, section 1.1235-1(c), Income Tax Regs., provides in part: (2) Payments to an employee. Payments received by an employee as compensation for services rendered as an employee under an employment contract requiring the employee to transfer to the employer the rights to any invention by such employee are not attributable to a transfer to which section 1235 applies. However, whether payments received by an employee from his employer (under an employment contract or otherwise) are attributable to the transfer by the employee of all substantial rights to *21 a patent (or an undivided interest therein) or are compensation for services rendered the employer by the employee is a question of fact. In determining which is the case, consideration shall be given not only to all the facts and circumstances of the employment relationship but also to whether the amount of such payments depends upon the production, sale, or use by, or the value to, the employer of the patent rights transferred by the employee. If it is determined that payments are attributable to the transfer of patent rights, and all other requirements of section 1235 are met, such payments shall be treated as proceeds derived from the sale of a patent. See also William Tiffin Downs, supra; Roland Chilton, 40 T.C. 552, 561 (1963). The fact that petitioner was obligated to perform services by the terms of the Option does not, as respondent believes, dispose of this case. If the essence of a transaction is the sale of a patent or the grant of an option and the performance of services is only a step in developing the property transferred or to be transferred, the special nature of patents for tax purposes requires that the consideration paid be treated *22 as received for the patent or, as in this case, the option to acquire the patent. Against the foregoing background, we proceed to analyze the true nature of the transaction between petitioner and Chemetron. Of the three writings in evidence, the Option Agreement is the most pertinent, since the $40,000 payment was made pursuant to it. The wording of the Option shows that the parties bargained over the rights to petitioner's invention and improvements thereon, and not over his services. The introductory paragraphs recite that petitioner "represents that he is the owner of the entire and unencumbered right, title and interest in and to the * * * inventions," that "Chemetron desires to obtain an exclusive license from Gable under said inventions," and that "Chemetron is willing to advance certain funds for certain further investigation." By clause 2, Chemetron agrees "to provide funds * * * for research and development * * * in accordance with written directions and program provided by Gable * * * and consented to by Chemetron." Petitioner's research obligation is described as an "80% program" by which petitioner in clause 4 "agrees to continue to devote 80% of his time * * * in *23 carrying out further work, development and experiments to solve technical problems." Clause 3 grants an option to Chemetron to acquire the invention within thirteen months. The gist of this language is that Chemetron acquired, not an option plus services, but an option plus a research program designed to make that option (and the underlying patent) more valuable. From Chemetron's point of view, it was making an investment in property sought to be acquired; from petitioner's, the program was intended to enhance the value of the patent and hence (through the percentage royalty agreement) the purchase price. Most significant is the section of clause 4 relating to the effect of termination of the agreement without the exercise of Chemetron's option. In that event, petitioner was entitled to retain not only the result of his own development work, but also any work performed by Chemetron with respect to his invention. This strongly suggests that the patent rights, and not petitioner's personal services, were the focus of the agreement. It also negates the existence of any strict employment relationship, since if such a relationship existed, Chemetron as employer normally could assert *24 ownership of petitioner's work product ( Arthur N. Blum, 11 T.C. 101 (1948), affd. 183 F.2d 281 (C.A. 3, 1950)) and would necessarily be under no obligation to surrender its own. [2]
A further indication that amounts received under the Option should not be treated as compensation is found in clause 6 of the License, incorporated by reference in the Option Agreement, requiring the advances to be repaid out of royalties under certain conditions. Petitioner was to receive royalties calculated as a varying percentage of quarterly sales, depending on the source of the sale, but royalties were never to be less than a specified yearly minimum dollar amount. Chemetron could recoup its development expenditures made under the Option by a reduction of up to 25 percent in the percentage royalty (but not the minimum royalty) payable each year. Respondent would have us disregard this deduction feature; from the fact that no royalties in excess of the minimum have *25 been paid, he infers that none were anticipated and that the pay-back provision was, in effect, a sham. We cannot follow respondent's lead on this issue. First, the presence of technical problems when the License was drafted in 1969 inhibited an evaluation of the still-unexplored potential of the commercial exploitation of the compounds. It is unlikely the parties would have been able to agree on a fixed liquidated amount as the sole compensation for the patent transfer. Further, while Chemetron made no commitment at that time, a year later it executed the License according to the originally contemplated terms. This is persuasive that in 1970 Chemetron considered the invention to be worth at least the minimum royalty amount, which, in turn, strongly indicates that the 1969 agreement in good faith anticipated the possibility of royalties in excess of the minimum. It is, to say the least, curious that, if the reduction for payments under the Option was never intended to take effect, the parties would have taken the trouble to erect an elaborate royalty schedule and then limited reductions to 25 percent of such additional royalties. The record is devoid of any evidence indicating *26 that these provisions were disingenuously inserted to bolster for tax purposes the credibility of a sham agreement and we think it unlikely that any such literary posturing was contemplated. We think that, to the extent that services were involved herein, they were subsidiary to the grant of the option and the transfer of the petitioner's invention. It is an established rule that a contract to assign patent rights can require the transferor to furnish services in connection with the sale without affecting the capital nature of the entire proceeds. E. I. DuPont de Nemours & Co. v. United States, 432 F.2d 1052, 1057-1058 (C.A. 3, 1970), affirming in part and reversing in part 296 F. Supp. 823 (D. Del. 1969); Bell Intercontinental Corporation v. United States, 381 F.2d 1004, 1020 (Ct. Cl. 1967); PPG Industries, Inc., 55 T.C. 928, 1015-1016 (1970); United States Mineral Products Co., 52 T.C. 177, 199 (1969); Heil Co., 38 T.C. 989, 1002 (1962). [3] The principle underlying these decisions, which are not limited to situations involving section 1235, reflects the recognition that a patent transfer is, *27 in large part, a transfer of knowledge. In any sale of technical information and know-how, the buyer is likely to require the assistance of the seller in implementing the acquired knowledge and developing its full potential. The rule is applied to exempt from treatment as "services" not only the communication of existing know-how, but the development of further information as long as it relates to the property transferred and constitutes assistance rendered in connection with the transfer.To be sure, all of the above-cited decisions involved the furnishing of assistance and know-how after the transfer of the patent rights. But we think that the fact that petitioner's services were rendered in the preacquisition period does not necessarily deprive him of the benefit of the principle to be derived from those decisions, where the development of the underlying invention had progressed to such a point that only "technical problems" relating to commercial marketability remained. Thus, the situation herein is to be sharply distinguished from that which would exist if the invention in question did not exist or was in a clearly embryonic stage and the payments were made for services to *28 be rendered in creating or further developing the invention. The situation herein is also distinguishable from that involved in cases where the payments are found to have been intended as compensation for services unrelated to, or merely tangential to, the transfer of patent rights, as contrasted with being an integral part of, and subsidiary to, such a transfer. This contrast is dramatized in Arthur C. Ruge, 26 T.C. 138 (1956). There, the taxpayer and his co-inventor sold a patent covering electrical strain gages and agreed to furnish up to 60 days of consulting services per year to assist the buyer in the "establishment, or subsequent control, of its manufacturing operations of electrical strain gages or applications thereof or of rendering consulting services relating to or embodying strain responsive apparatus." Separate consideration was allocated to their undertaking to supply their "best efforts and thoughts for promoting the strain gage business." Payments under the first clause *29 were held to be capital in nature, while those made under the "best efforts" provision were compensation for services and taxable as ordinary income. We believe that the research work performed here by petitioner is more closely analogous to the services called for by the first clause in Ruge, for the reason that it related to the development and implementation of the particular invention transferred rather than the general advancement of the purchaser's business. See also C.A. Norgren Co. v. United States, 268 F. Supp. 816, 824 (D. Colo. 1967); Spence v. United States, 156 F. Supp. 556 (Ct. Cl. 1957); Kimble Glass Co., 9 T.C. 183 (1947). Although the issue is not entirely free from doubt, we conclude, on the basis of all the facts and circumstances revealed by the record herein, that the $40,000 received by petitioner from Chemetron in 1969 did not constitute compensation for services but rather was payment for an interest in the product of petitioner's work and that to the extent that petitioner's services were involved they were subsidiary to the option and transfer involved herein. Cf. Roland Chilton, supra. Respondent's *30 citation of Bouchard v. Commissioner, 229 F.2d 703 (C.A. 7, 1956), affirming a Memorandum Opinion of this Court, is inapposite; although that case also concerned advances to be repaid out of prospective profits, no option was involved and the payments were compensation for services. One final word. Petitioner has merely asserted that the $40,000 should be treated as capital gain rather than ordinary income in 1969. He has made no claim that under Rev. Rul. 57-40, supra, the payments in question should not be taxable to him until 1970, the year in which the option was exercised. If he had made such a claim, we might have considered it and even decided in petitioner's favor. But in such event, it would appear that respondent would have been able to invoke the mitigation provisions of sections 1311-1315. However, without such claim having been made, there would be serious doubt as to the application of the mitigation provisions. Compare Kent Homes, Inc. v. Commissioner, 455 F.2d 316 (C.A. 10, 1972), reversing 55 T.C. 820 (1971). Under all the circumstances, we decline to deal with the year-of-taxability issue. See, e.g. *31 , J. William Frentz, 44 T.C. 485, 490-491 (1965), affd. 375 F.2d 662 (C.A. 6, 1967).
To reflect out conclusion and the concessions of the parties on other issues, Decision will be entered under Rule 155. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended and in effect during the period at issue herein.
SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General. - A transfer (other than by gift, inheritance or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are - (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. (b) "Holder" Defined. - For purposes of this section, the term "holder" means - (1) any individual whose efforts created such property, * * * The fact that no patent was actually issued at the time of the transfer is no bar to the application of section 1235. Franklin S. Speicher, 28 T.C. 938↩ (1957). For convenience, the term "patent" will sometimes be used to refer to the rights transferred by petitioner or subject to the option granted to Chemetron. 2. Respondent has not argued that the arrangement between petitioner and Chemetron constituted a joint venture. Compare Kleinschmidt v. United States, 146 F. Supp. 253↩ (D. Mass. 1956). 3. See also Raymond M. Hessert, a Memorandum Opinion of this Court, dated October 31, 1947, 6 T.C.M. 1190 (1947); Rev. Rul. 64-56, 1964-1 C.B. 133↩.