CARMELO V. OFRIA AND MARJORIE P. OFRIA, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 12304–77, 12305–77,     Filed August 31, 1981.
12306–77, 4671–78.

---

[1]Cases of the following petitioners are consolidated herewith: James M. Ofria and Grace C. Ofria, docket No. 12305–77; Constance R. Ofria, docket No. 12306–77; and Carmelo V. Ofria and Marjorie P. Ofria, docket No. 4671–78.

*Burton L. Williams*, for the petitioners.
*Charles W. Maurer, Jr.*, for the respondent.

RAUM, *Judge*: The Commissioner determined the following deficiencies with respect to petitioners' 1972, 1973, and 1974 income taxes:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 12304–77 | Carmelo V. and | | |
| | Marjorie P. Ofria...... | 1972 | $18,074.05 |
| 4671–78 | do ............. | 1973 | 47,567.43 |
| | | 1974 | 27,355.28 |
| 12305–77 | James M. and Grace | | |
| | C. Ofria.................. | 1972 | 22,182.47 |
| | | 1973 | 43,760.36 |
| | | 1974 | 29,556.18 |
| 12306–77 | Constance Ofria[2] ....... | 1972 | 18,168.03 |
| | | 1973 | 51,678.00 |
| | | 1974 | 30,532.25 |

The husband-petitioners and Constance Ofria are three of the four equal shareholders of Contract Machining Corp. (CMC), an electing small business corporation. At issue is whether payments received by CMC pursuant to the value engineering incentive clause in a production contract with the Air Force are gain from the sale of capital assets or ordinary income.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts and related exhibits are incorporated herein by reference.

At the time of the filing of their petitions herein, petitioners resided in Massachusetts.

Petitioners Carmelo Ofria, James Ofria, and Constance Ofria, are three of the four equal shareholders of Contract

---

[2]The Commissioner also determined that petitioner Constance Ofria was liable for a $1,186.18 addition to tax under sec. 6651(a), I.R.C. 1954, with respect to 1974. Although Constance Ofria's petition purports to place the addition to tax in issue, she introduced no evidence as to this matter at trial, and the Commissioner's determination must therefore be sustained in this respect. See Rules 142(a), 149(b), Tax Court Rules of Practice and Procedure.

Machining Corp. (CMC), a Massachusetts corporation organized in 1961 with principal offices in Burlington, Mass. It elected in 1966 to be taxed as a small business corporation pursuant to section 1371, I.R.C. 1954, and this election had not been revoked as of the time of the trial of this case.

CMC engages in the business of machining metal parts for both Government and commercial enterprises. It does not manufacture a product as such but produces items pursuant to subcontract or contract specifications.

Petitioner Carmelo V. Ofria, president of CMC, manages the production aspects of its business. Upon graduating from high school, he became a toolmaker's apprentice with the General Electric Co. After serving in the Air Force during World War II, he returned to General Electric. In 1952, he and his brothers formed a partnership and began a machining business which was subsequently incorporated as CMC. This business expanded from a total of three employees in 1952 to approximately 70 employees during the years 1972 through 1974.

Petitioner James M. Ofria, treasurer of CMC, manages the financial aspects of the business, including sales.

On February 16, 1969, CMC was awarded a contract by the Department of Defense to manufacture a fuze bomb coupler. CMC had never manufactured such devices before, and Government investigators in finance, productivity, and quality control examined CMC's operations prior to the award of the contract to CMC. CMC completed the contract in February 1970.

On January 16, 1970, the Department of the Air Force made a public solicitation for bids for the manufacture and supply of 238,854 additional fuze bomb couplers. Specifications for the coupler were publicly available as part of the solicitation for bids and were not subject to any security classification. CMC made a formal offer to produce the coupler, and on April 13, 1970, the Department of the Air Force awarded CMC a contract to produce 238,854 couplers at a unit price of $1.95. This contract was modified on July 22, 1970, to require an additional 4,080 couplers at the same unit price. CMC and the Department of the Air Force subsequently entered into three

additional contracts for the manufacture and supply of couplers.

A coupler of the type covered by the contract of April 13, 1970, is in evidence. It is a cylindrical device approximately 2 inches high and 2⅜ inches in diameter.[3] The external structure of the coupler is composed of a cylindrical aluminum housing. An input shaft projects from the top of the housing; an output shaft at the bottom of the housing attaches to the fuze of the bomb. Each shaft passes through the housing. The input shaft and the output shaft are linked by the governor subassembly and the governor drum, which are inside the housing. The governor subassembly is composed of a flat steel disc called a governor plate, four movable wedge-shaped aluminum weights, each covering one-quarter of the governor plate, eight rivets holding the weights to the governor plate, and a coil spring wrapped around the outer edge of the weights.

The function of the coupler is to "arm" the fuze of the bomb. The bomb is initially unarmed and thus will not explode in the airplane. As the bomb is dropped from the airplane, the input shaft begins to spin. The input shaft drives the output shaft, which is attached to the fuze of the bomb. However, the number of revolutions per minute (rpm) of the output shaft is controlled by the governor mechanism. As the rpm of the input shaft increases, centrifugal force causes the weights on the governor plate to slide out from the center of the governor plate, thus disengaging the governor drum and breaking the link between the input shaft and the output shaft. The output shaft thus stops turning and engages the fuze.

The contract between CMC and the Air Force contains a "value engineering incentive" clause. This clause applies to cost reduction proposals voluntarily initiated and developed by the contractor for changing the drawings, designs, specifications, or other requirements of the contract. The clause provides, in part, that if a cost reduction proposal is accepted by the Government, the contractor is entitled to share in the

---

[3]A proposed finding submitted by respondent and not objected to by petitioners refers to the coupler described in the specifications as being approximately 4 inches high and 4¾ inches in diameter. The discrepancy between that description and the coupler physically placed in evidence is unexplained.

savings under the contract and to receive a royalty for savings in existing and future contracts between the Government and any other parties.[4] The clause also provides that if a proposal is accepted, "the Contractor * * * grants to the Government all rights to use, duplicate or disclose, in whole or in part, in any manner and for any purpose whatsoever, and to have or permit others to do so, any data reasonably necessary to fully utilize such proposal." See generally 32 C.F.R. sec. 1.1707–1(a) (1970). The contract also incorporates by reference certain contract clauses set forth in the Armed Services Procurement Regulations, including a rights in technical data clause. See 32 C.F.R. secs. 7.104–9(a), 9.203(b) (1970).

Shortly after receiving word that CMC was the low bidder for the 1970 contract to supply 238,854 additional fuze bomb couplers, Carmelo Ofria began work in improving the fuze bomb coupler. His efforts ultimately resulted in four separate improvements.

The first improvement involved the elimination of the eight rivets and their corresponding holes in the weights of the governor plate assembly. As a consequence, the coupler would be easier and less costly to manufacture. Moreover, there would be a definite improvement in the coupler by reducing

---

[4]The contract provides that if a cost reduction proposal is accepted pursuant to the value engineering incentive clause, "the Contractor is entitled to share in instant contract savings, collateral savings, and future acquisition savings." Instant savings are savings in the contractor's cost of performing the contract. The Apr. 13, 1970, contract between CMC and the Air Force provides that if a value engineering change proposal is accepted, and CMC's cost of performance is reduced, the contract price will be reduced by 30 percent of CMC's decreased costs of performance, thus providing CMC with a 70-percent share of the "instant contract savings." The "collateral savings" and "future acquisition savings" provisions grant CMC a share of the cost savings realized on other existing and future defense contracts incorporating the value engineering proposals, regardless of whether these contracts are with CMC or other defense contractors. See generally 32 C.F.R. sec. 1.1703–3 to –4 (1970). "Collateral savings" are savings "in such areas as Government-furnished property * * * operations, or logistic support," and CMC is entitled to receive 10 percent of such savings "estimated to accrue to the Government during an average or typical year of use of the item in which the change is incorporated." "Future acquisition savings" are savings "realized by the Government on future purchases, if any, of items utilizing the cost reduction proposal." The Apr. 13, 1970, contract between CMC and the Air Force provides that if a proposal is accepted under the value engineering clause, CMC shall receive a "royalty share" of 40 percent of the unit cost reduction of each fuze bomb governor coupler which (i) is manufactured under a future contract incorporating the cost reduction proposal and (ii) is scheduled for delivery within 3 years. In addition, CMC is to receive a 40-percent royalty share of the unit cost reduction of each fuze bomb governor coupler which is manufactured under an existing contract, incorporating the cost reduction proposal.

the possibility that the weights on the governor plate assembly would stick and prevent the coupler from functioning properly. Working primarily at night or on Saturdays when other employees were off duty, petitioner Carmelo Ofria redesigned the governor plate assembly, eliminating the rivets, adding a tongue to the weights, and attaching the weights to the governor plate through slots added to the governor plate. The materials that he worked on in developing this improvement were locked in his desk drawer and locked in his office when he left the premises.

After Carmelo Ofria perfected the improved governor plate assembly, CMC prepared pilot models and acquired the necessary tooling to manufacture the new units. CMC also submitted models for environmental testing by Associated Testing Labs, and had blueprints prepared showing the new design. Associated Testing Labs is a Government-approved facility at which there is a full-time in-house Government inspector.

On September 4, 1970, CMC submitted a contract change proposal incorporating the above design changes pursuant to the value engineering incentive clause of its contract with the Air Force. CMC's cost in developing the proposal was $21,555. The estimated cost savings from the new design were 14 cents per unit. By a letter dated September 29, 1970, the Air Force accepted CMC's foregoing value engineering change proposal (VECP), and requested that it be implemented in CMC's contracts with the Government. Contract modifications incorporating the proposal in CMC's April 13, 1970, coupler contract were approved by the Air Force on December 4, 1970.

The first value engineering change proposal (VECP–1) is described in the stipulation as follows:

a redesign of four aluminum die cast weights by eliminating in each two aligned drill holes and by adding to each an integrally formed symmetrically arranged tongue and groove on one side; a redesign of the governor plate to provide for radially arranged key hole slots. Each slot is formed in the shape of a "T" with the cross member of the "T" formed by a strip of the plate that is, by progressive die cutting, initially formed in a plane offset from the major plane of the governor plate; utilization of an assembly process which included elimination of precision drilling of eight small holes in each assembly and the use of eight rivets as fasteners. All four weights are locked into the governor plate simultaneously rather than individually by rivets.

During 1970, CMC was having the aluminum housing for the coupler manufactured in California, and was encountering

difficulties with delivery and quality. Carmelo Ofria, working alone, attempted to replace the aluminum housing with a type of plastic. After trying various types of plastic without success, he learned of a plastic called Lexan, a commercially available plastic with known qualities. He purchased some Lexan rods and made several housings out of Lexan; in testing the housings, he found that they remained stable at the temperatures required in the coupler specifications.

Following the successful preliminary testing of the Lexan housing, CMC contracted to have molds made for the production of a Lexan housing. The housing was made through injection molding, the insertion of powdered Lexan into a mold where it solidifies under heat and pressure. CMC incurred expenses of $33,450 for preparation of the molds. Blueprints were also prepared, and samples of the housing were produced. The samples were tested by Associated Testing Labs. CMC's total costs in developing this improvement were $37,855.

The Lexan housing developed by CMC was lighter than the aluminum housing used in the original design of the coupler, and also would not corrode. A visual examination of the housing would not have disclosed that it was made of Lexan, although the plastic could have been identified by a laboratory analysis.

At some time prior to January 20, 1971, CMC submitted a second value engineering change proposal (VECP–2) wherein it estimated the cost savings which would accrue from the use of the Lexan housing. Following correspondence between CMC and the Air Force, a revised proposal was submitted on February 19, 1971. The substitution of the plastic housing for the aluminum housing was estimated to result in savings of $0.155 per unit. CMC also claimed savings for reduced freight costs due to the lesser weight of the plastic housing. On May 3, 1971, the Air Force sent CMC a form incorporating VECP–2 into the April 13, 1970, coupler contract.

VECP–2 is described in the stipulation as follows:

the use of a polycarbonate material for construction of the fuze bomb coupler governor housing assembly in place of die cast aluminum, with the necessary strength, weight, thermoconductivity, and vibration resistance to function satisfactorily in the environmental conditions encountered during the use of the device.

Early in 1971, Carmelo Ofria considered the possibility of replacing the metal ball bearings in the original coupler with a plastic bearing. Difficulty had been encountered from time to time in inserting the bearing into the housing without causing damage to the coupler. Sometimes the bearing would not come in properly from the automatic machines inserting it, and tools that were needed for production would be seriously damaged, causing a shutdown for 6 to 10 hours. This occurred once or twice a week during the contract run. Steel bearings also had to be oiled before they were inserted into the housing. If the coupler was kept on a shelf long enough, the oil would dissipate and the bearings would rust. Such rusting could prevent the coupler from functioning.

To overcome the foregoing disadvantages, Carmelo Ofria redesigned the base of the plastic housing so that the housing itself provided a sleeve bearing to support the shaft, thereby eliminating altogether the steel roller bearing which supported the output shaft. After Carmelo Ofria's preliminary tests, CMC ordered changes in the design of the mold for the Lexan coupler housing. Blueprints were prepared, and samples of the Lexan coupler housing employing the new design were produced and tested. CMC incurred a total of $4,146 in research and development expenses in the preparation of the new design.

CMC submitted a third value engineering change proposal (VECP–3) incorporating the redesigned housing eliminating the metal bearing on May 4, 1971. The estimated savings from use of the new design were $0.236 per unit. VECP–3 was accepted by the Air Force on June 16, 1971, and VECP–3 was incorporated into the April 13, 1970, contract on October 18, 1971.

As set forth in the stipulation of facts, VECP–3 is described as follows:

elimination of a steel roller bearing which functioned as an interface between the fuze bomb coupler governor assembly housing and the shaft of the governor plate; design of a bearing surface made of a polycarbonate material and consisting of two concentric walls connected by four radial ribs in order to provide adequate heat dissipation and shaft support.

Carmelo Ofria finally attempted to eliminate the remaining steel bearing in the coupler. The bearing was a steel roller bearing which supported the input shaft, and Carmelo Ofria

tried to substitute a plastic sleeve bearing. He tried making bearings out of Lexan and a dozen other plastics, but none worked when he tested the bearing under the conditions required by the coupler specifications. He finally discovered a plastic called Bemol and found he could make bearings which seemed to pass the required tests. Bemol was not developed by CMC, is commercially available, and its qualities are known. However, after placing an order with the manufacturer of Bemol for the production of the bearings, the manufacturer advised CMC that it could not economically manufacture the bearings because the tools used to make the bearings were disintegrating due to Bemol's abrasive qualities. Carmelo Ofria then suggested the use of injection molding to make the bearings from Bemol powder. This proved successful, and CMC incurred tooling expenses and had drawings prepared to reflect the new design. CMC's total research and development costs for developing and testing the Bemol bearing were $2,160. A visual examination of the coupler would not have identified the plastic used as Bemol, but the plastic could have been identified by laboratory analysis.

On July 28, 1971, CMC submitted a fourth value engineering change proposal (VECP–4) incorporating the use of the Bemol bearing in the coupler. The estimated cost savings from the use of the Bemol sleeve bearing instead of the steel roller bearing were $0.292 per unit. VECP–4 was accepted by the Air Force on November 2, 1971. On January 21, 1972, VECP–4 was incorporated into a contract entered into between CMC and the Air Force on September 11, 1970.

As set forth in the stipulation of facts, VECP–4 can be described as follows:

design of a bearing made of a cellulose-phenolic material for use as an interface between the cover of the fuse bomb coupler governor assembly and the lower end of the shaft of the governor plate and elimination of a steel roller bearing; design of a process for staking the cellulose-phenolic bearing to the polycarbonate cover.

As a result of the implementation of CMC's value engineering change proposals, the following gross cost savings per coupler resulted:

VECP–1 .................................... $0.186
VECP–2 .................................... 0.205

VECP–3 ..................................... $0.314
VECP–4 ..................................... 0.292
                                            0.997

From September 9, 1971, through April 27, 1973, the Air Force sent CMC various contract modification forms providing for the payment of the following total amounts on account of the implementation of the four value engineering change proposals in defense contracts with CMC and with third party contractors:

VECP–1 .............................. $325,998.59
VECP–2 .............................. 356,357.24
VECP–3 .............................. 545,834.99
VECP–4 .............................. 370,782.35

These four proposals were the only value engineering contract proposals submitted by CMC and accepted by the Air Force.

The design of the coupler did not possess a security classification of any sort at the time CMC first contracted with the Air Force for the manufacture of the item. Likewise, the coupler's design is unclassified information today.

The redesign of the governor assembly, which was set forth in VECP–1, would be disclosed in part by an inspection of a coupler incorporating the proposal, without reference to the blueprints or specifications which describe the proposal; however, studies by an engineer would be required to determine how to place the redesigned weights onto the redesigned governor plate. Similarly, the general structure of the plastic housing set forth in VECP–2, and the plastic structures used in VECP–3 and VECP–4 to replace the steel bearings, would be disclosed by an inspection of a coupler incorporating the proposals, without reference to the blueprints or specifications which describe the proposals. Visual examination of couplers incorporating VECP–2, VECP–3, and VECP–4 would not identify the plastics used as Lexan and Bemol, although laboratory analysis would disclose the nature of the plastics used.

On its Federal income tax returns, CMC reported the following amounts received from the Air Force as its share of cost savings resulting from the four value engineering change proposals:

| | |
|---|---|
| 1972 | $548,349 |
| 1973 | 586,383 |
| 1974 | 439,920 |

These amounts were reported as long-term capital gains. Petitioners' respective shares of the corporation's long-term capital gains were reported on their individual income tax returns.

The parties agree that any property interest CMC might have had in any value engineering contract proposal was held by CMC for more than 6 months prior to the time the proposal was incorporated into any of the contracts with the Air Force.

## OPINION

The Government argues that the value engineering clause of the contract intended the performance of engineering services by CMC, rather than the transfer of all substantial rights to a patent or trade secret or know-how. In the Government's view, the value engineering incentive clause does not effect a transfer of any property, and the payments received by CMC were thus payments for services rendered incident to performing its contract with the Air Force, not payments for a "capital asset" as defined in section 1221, I.R.C. 1954. Alternatively, the Government contends that even if the value engineering incentive clause can be construed to effect a transfer of property rights, the value engineering proposals submitted by CMC were not patentable inventions or trade secrets, and thus cannot be considered capital assets.

Petitioners argue that CMC voluntarily developed inventions for the improvement of the fuze bomb coupler at its own expense and kept these inventions secret. They contend that the Air Force's acceptance of the value engineering proposals effected a sale of all rights to use, duplicate, and disclose the inventions, and that payments under the value engineering clause were payments received for the sale of capital assets. Petitioners also maintain that the rights in the four value engineering change proposals transferred under the value engineering clause of the contract were trade secrets or know-how properly qualifying as property under section 1221, I.R.C. 1954.

We hold that as a matter of contract interpretation, CMC

was retained only to produce a fixed number of couplers in accordance with specifications, and that the payments received under the value engineering clause were payments for "data"[5] rather than compensation for engineering services. We also find that the value engineering change proposals submitted by CMC incorporated trade secrets or know-how which were capital assets within the meaning of section 1221, I.R.C. 1954.

The difficulty in determining whether payments to a creator of an invention or valuable commercial process are compensation for services or payments for the sale of a patent or other capital asset stems from the fact that an invention is merely the fruit of the inventor's labor, and that payment for the invention itself necessarily compensates the inventor for his services in creating the invention. See *Gable v. Commissioner*, a Memorandum Opinion of this Court, 33 T.C.M. 1427, 1432, 43 P-H Memo T.C. par. 74,312, at 1358–1359 (1974). This difficulty increases when the inventions transferred are not patents, and thus within section 1235, I.R.C. 1954, but rather are more amorphous assets such as trade secrets or know-how which might be characterized as capital assets under section 1221, I.R.C. 1954. Nonetheless, such intangibles may in appropriate circumstances be classified as capital assets (see *United States Mineral Products Co. v. Commissioner*, 52 T.C. 177, 196–199 (1969)), and we must accordingly determine whether the payments CMC received for the value engineering change proposals were in fact compensation for services performed under its contract with the Air Force or were payments for capital assets. In making this essentially factual determination (see *Beausoleil v. Commissioner*, 66 T.C. 244, 247 (1976)), we will be guided by the principles developed in cases involving the transfer of patents, which are equally applicable to payments for commercially valuable trade secrets or know-how or data similar to patents.

In general, it has been held that when an inventor is employed for the purpose of developing inventions for his employer, and the contract between the parties provides that inventions developed during the performance of the contract

---

[5]See note 6 *infra*, for the technical meaning of the term "data" as used in this context.

became the property of the employer, then the payments to the inventor are in the nature of compensation for services, taxable as ordinary income. Conversely, if the contract does not provide that the fruits of the inventor's labor belong to the employer, and the inventor therefore has transferable property rights in his inventions, then payments in consideration of the transfer of these rights are payments in exchange for property and may qualify as gain from the sale of capital assets. Compare *Downs v. Commissioner*, 49 T.C. 533, 537–539 (1968), and *Blum v. Commissioner*, 11 T.C. 101, 108–110 (1948), affd. 183 F.2d 281 (3d Cir. 1950), with *Melin v. United States*, 201 Ct. Cl. 748, 478 F.2d 1210, 1213–1215 (1973); *McClain v. Commissioner*, 40 T.C. 841, 849–850 (1963), and *Chilton v. Commissioner*, 40 T.C. 552, 562–563 (1963).

From an examination of all the evidence, we find that the payments CMC received under the value engineering clause of its contract with the Air Force were not compensation for services, but were payments for property. Accordingly, the payments received by CMC pursuant to the value engineering clause may be treated as gain from the sale of a capital asset, provided that we find that the property rights included in the value engineering change proposals were in fact capital assets within the meaning of section 1221, I.R.C. 1954.

It is clear that the contract change proposals CMC submitted under the value engineering clause were not a required part of its performance under the contract. The relevant Armed Services Procurement Regulations in effect at the time the contract was entered provide for two types of value engineering provisions. One type of value engineering clause, a value engineering *incentive* clause, offers a contractor an incentive to reduce contract costs by receiving a share of the cost savings from changes in the contract specifications; absent such an incentive clause, contractors would likely be discouraged from submitting cost reduction proposals because acceptance of such proposals would reduce the contract price, and thus reduce the contractor's profits. See 32 C.F.R. sec. 1.1702–1(a) (1970). In sharp contrast to the value engineering *incentive* clause, a "value engineering program requirement" clause *requires* the performance of value engineering services as a separately priced line item under the contract so that "specifications, drawings, and production methods will reflect

the full benefit of value engineering." 32 C.F.R. sec. 1.1702–2 (1970). The value engineering clause incorporated in CMC's April 13, 1970, contract with the Air Force is a value engineering incentive clause, and it thus cannot successfully be contended that any inventions developed by CMC as a result of value engineering were the result of services *required* under the contract.

The Government nonetheless argues that the value engineering clause does not show any intent to transfer all substantial rights to a patent or trade secret to the Air Force and provides no consideration for any such transfer; since the value engineering clause purportedly intends no transfer of property rights, the Government maintains that payments under the value engineering clause can be nothing more than compensation for engineering services. Although the Government purports to bolster its argument with a thorough analysis of the Armed Services Procurement Regulations, the plain language of the contract between CMC and the Air Force provides for the transfer of all technical data[6] necessary for the use of the value engineering proposals, and we find that the payments to CMC were received in consideration for the transfer of such technical data.

Paragraph (h) of the value engineering incentive clause of the contract between CMC and the Air Force provides as follows:

(h) The Contractor may restrict the Government's right to use any sheet of a value engineering proposal or of the supporting data, submitted pursuant to this clause, in accordance with the terms of the following legend if it is marked on such sheet:

"This data furnished pursuant to the Value Engineering clause of contract _____ shall not be disclosed outside the Government, or duplicated, used, or disclosed, in whole or in part, for any purpose other than to evaluate a value engineering proposal submitted under said clause. This restriction does not limit the Government's right to use information contained in this data if it is or has been obtained, or is otherwise available, from the Contractor or from

---

[6]As defined in the Armed Services Procurement Regulations, "data" includes "writings, * * * pictorial reproductions, drawings, or other graphic representations and works of similar nature." 32 C.F.R. sec. 9.201(a) (1970). For convenience, we will from time to time use the term "data" or "technical data" to describe the blueprints, models, and other materials supporting CMC's value engineering proposals. However, the use of this term is not intended to resolve the question whether CMC's data qualified as a capital asset, which will be considered *infra*.

another source, without limitations. If such a proposal is accepted by the Government under said contract after the use of this data in such an evaluation, the Government shall have the right to duplicate, use, and disclose any data reasonably necessary to the full utilization of such proposal as accepted, in any manner and for any purpose whatsoever, and have others so do."

*In the event of acceptance of a value engineering proposal, the Contractor hereby grants to the Government all rights to use, duplicate or disclose, in whole or in part, in any manner and for any purpose whatsoever, and to have or permit others to do so, any data reasonably necessary to fully utilize such proposal.* [Emphasis added.]

As set forth above, if the Air Force accepts a value engineering proposal, CMC *grants* the Air Force *all* rights to use and disclose the technical data necessary to utilize the proposal. This language is clearly sufficient to transfer any property interest CMC had in the technical data to the Air Force. To be sure, CMC could have attempted to sell the technical data supporting the value engineering proposals to the Air Force independently of the value engineering clause,[7] thus clearly identifying the sales proceeds as receipts from the sale of the technical data. However, its election to proceed under the value engineering clause does not establish that the payments it received were merely compensation for services where the value engineering proposals resulted in the Air Force's acquisition of rights in the technical data developed by CMC. When each of the four value engineering proposals was accepted by the Air Force, such proposals reflected actual inventions—not necessarily patentable—which had been formally set forth in blueprints and models and laboratory tested for performance. Although it may be possible for a contractor to receive nothing

---

[7] Under 32 C.F.R. sec. 9.202–2(g)(1) (1970), the Government is authorized to acquire unlimited rights in technical data by means of negotiation with individual defense contractors. However, in determining whether to make such an acquisition, one of the factors the Government is obliged to consider is whether the cost savings from future procurements of the item utilizing the technical data will exceed its acquisition cost. Thus, the price CMC could obtain for its technical data would be based on the Government's cost savings—the same savings CMC would share under the value engineering clause. CMC's choice to proceed under the value engineering clause rather than negotiate for sale of the technical data should therefore not affect the characterization of payments received under the value engineering clause, since the payments it received would in any event be based on the Government's cost savings from the use of the technical data.

more than compensation for services for certain value engineering proposals,[8] the value engineering proposals herein actually transferred valuable data to the Air Force. In the circumstances, we are satisfied that the payments CMC received under the value engineering clause of its Air Force contract were payments in exchange for the transfer of all substantial rights to property,[9] and not compensation for services.

An additional question raised by this case is whether the payments CMC received under the value engineering clause were payments in exchange for capital assets. Petitioners have argued that three of the four value engineering proposals, VECP–1, VECP–3, and VECP–4, reflected patentable inventions and that the sale of the rights to such inventions qualifies as capital gain under section 1235, I.R.C. 1954. However, although there was evidence to the effect that these three value engineering proposals were sufficiently original to support the filing of a patent application, petitioners' expert had not conducted a search of the prior art in the field, and thus could not express an opinion that a patent would issue. Irrespective of any other defects in their case under section 1235, petitioners have not carried their burden of proving that any invention in the value engineering proposals would qualify as a patent under section 1235.

Despite petitioners' failure to establish the patentability of the data incorporated in the value engineering proposals, this does not preclude a finding that the data incorporated in each of the value engineering proposals represented valuable prop-

---

[8]See *Grismac Corp. v. United States*, 214 Ct. Cl. 39, 556 F.2d 494, 497–498 (1977), which notes that "mere suggestions" or ideas might entitle a contractor to compensation under a value engineering clause. In such a case where ideas have not been reduced to concrete inventions, there might well be a basis for questioning whether payments for such ideas could be considered anything more than compensation for services. However, that is not the situation here, and we express no opinion with respect to it.

[9]The fact that CMC continued to use the data after the transfer to the Air Force does not indicate that the transaction was not a completed sale of all of CMC's rights in the data. Although a transfer of trade secrets or know-how cannot be treated as a completed sale if the transferor retains substantial rights to use or disclose the trade secret or know-how, see, e.g., *E.I. duPont de Nemours & Co. v. United States*, 153 Ct. Cl. 274, 288 F.2d 904, 912 (1961), CMC granted the Air Force "*all* rights to use * * * or disclose" the data. (Emphasis added.) After the transfer, the Air Force publicly disclosed the data (see note 11 *infra*), and this disclosure provided the basis for CMC's use of the data, rather than a retention by CMC of rights that might otherwise be inconsistent with a complete transfer.

erty. Through the exercise of skill and inventiveness, Carmelo Ofria developed data which altered the design of the coupler. Through an innovative redesign of the weights and the governor plate, in VECP–1 he improved the function of the coupler and also made it less expensive to manufacture. Experimentation with different plastics led to the development of VECP–2 and VECP–3; both of these proposals changed the materials in the coupler, resulting in a lighter weight coupler and eliminating potential functional problems such as corrosion or rusting. In the development of VECP–4, Carmelo Ofria found a new type of plastic for use in the coupler and also created a new process for producing bearings from this plastic, thus further reducing the cost of the coupler. Each of these value engineering proposals reflected a novel advance over the prior art in the manufacture of couplers, as reflected in the then-current design specifications. Moreover, CMC expended significant sums for blueprints, models, and environmental testing to demonstrate the value of the data in each of the proposals. Throughout the development of the data incorporated in each of the value engineering proposals, Carmelo Ofria worked alone, and did not disclose the improvements in the coupler design, except as necessary for the preparation of blueprints and testing reports required for the acceptance of the value engineering proposals. These facts indicate the existence of a trade secret or other property right, and we thus find that petitioners have established that each of the value engineering proposals incorporated trade secrets, know-how, or unpatented technology protectable as a form of property. See *Atlantic Wool Combing Co. v. Norfolk Mills, Inc.*, 357 F.2d 866, 868–869 (1st Cir. 1966); *Eastern Marble Products Corp. v. Roman Marble, Inc.*, 372 Mass. 835, 364 N.E.2d 799, 801–802 (1977); *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840, 282 N.E.2d 921, 925 (1972); Restatement, Torts, sec. 757, comment b. Petitioners have established that each of the value engineering proposals incorporated property, and we thus must determine whether such property qualifies as a capital asset under section 1221.

Section 1221 defines "capital asset" as "property held by the taxpayer" exclusive of inventory or property held "primarily for sale to customers in the ordinary course of * * * business"; real or depreciable property used in the taxpayer's business;

copyrights, or literary property held by the creator of the property; and various other types of property. However, despite the all-encompassing nature of the phrase "property held by the taxpayer," the Supreme Court has stated in *Commissioner v. Gillette Motor Transport, Inc.*, 364 U.S. 130, 134 (1960):

it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year.

Bearing in mind the Supreme Court's admonition, we are satisfied that the technical data transferred to the Air Force as a result of its acceptance of the value engineering proposals qualified as capital assets under section 1221. Although these inventions have not been shown to be patentable, and thus cannot qualify for capital gain treatment under section 1235, they were commercially valuable improvements over the existing art sufficiently akin to patentable inventions to qualify as capital assets under section 1221, either as trade secrets or know-how or unpatented technology.

As we stated in *United States Mineral Products Co. v. Commissioner*, 52 T.C. at 196–197, "The right of property in industrial knowledge has long been recognized by this Court." In that case we held that manuals, reports, and other documents describing the methods for manufacturing a sprayed insulation product were capital assets. 52 T.C. at 197–199. In *Heil Co. v. Commissioner*, 38 T.C. 989, 1003 (1962), we held that "the engineering and manufacturing information, or know-how, pertinent and necessary to the successful manufacture of" various patented products qualified as capital assets when they were transferred with the necessary patents. See also *Hooker Chemicals & Plastics Corp. v. United States*, 219 Ct. Cl. 161, 591 F.2d 652, 659–662 (1979). *Speicher v. Commissioner*, 28 T.C. 938, 944–945 (1957), permitted an inventor to realize capital gains on the assignment of an unpatented machine. In *Wall Products, Inc. v. Commissioner*, 11 T.C. 51, 56–58 (1948), this Court held that a secret formula for curing concrete was property, and that a corporation was entitled to

deduct payments of reasonable royalties for use of the formula as ordinary and necessary business expenses, notwithstanding that a competent chemist could break down the formula into its component parts. Various other cases have also considered trade secrets or unpatented industrial knowledge to be capital assets, although ultimately finding in some instances that there was no complete sale of all substantial rights in the trade secrets or know-how concerned. See *Pickren v. United States*, 378 F.2d 595, 599–601 (5th Cir. 1967); *E.I. duPont de Nemours & Co. v. United States*, 153 Ct. Cl. 274, 284–288, 288 F.2d 904, 910–912 (1961); *Glen O'Brien Partition Co. v. Commissioner*, 70 T.C. 492, 502 (1978); *Taylor-Winfield Corp. v. Commissioner*, 57 T.C. 205, 213 (1971); affd. 467 F.2d 483 (6th Cir. 1972); *PPG Industries, Inc. v. Commissioner*, 55 T.C. 928, 1011–1012 (1970); *Commercial Solvents Corp. v. Commissioner*, 42 T.C. 455, 467 (1964).

Despite the longstanding acceptance of trade secrets and unpatented technology as capital assets, the Government asserts that the data CMC transferred to the Air Force did not qualify as a capital asset. The Government argues that since CMC did not use the restrictive legend provided in paragraph (h) of the value engineering clause, *supra* at 537–538, CMC forfeited its rights in the data by submitting the proposal. The Government further contends that since the property right qualifying trade secrets as capital assets is the right to a competitive advantage by use of data unknown to others, a sale of fuze bomb couplers manufactured by use of CMC's data would have disclosed the data, thus destroying any competitive advantage, and that CMC's data thus did not possess sufficient property characteristics to qualify as a capital asset. We are not persuaded by either of these contentions.

We do not find CMC's failure to utilize the restrictive legend provided by paragraph (h) of the value engineering clause, *supra* at 537–538, significant in the circumstances of this case. If the Government's construction of paragraph (h) is accepted, by submitting the value engineering proposals without the restrictive legend, CMC would have given away its rights in the data incorporated in the proposals, and the Government would be free to use the data as it wished. However, the parties themselves placed no such construction on the terms of the contract; instead, the Air Force paid CMC over $1.5 million in

exchange for the data in the value engineering proposals. Had the language of paragraph (h) been interpreted as the Government contends, these payments would have been wholly unnecessary, as the submission of the proposals without a legend would have given the Air Force all rights to use the data incorporated therein as it saw fit.

Moreover, in view of the limited market for the data in the value engineering proposals if such proposals had not been accepted by the Air Force, CMC's failure to use a restrictive legend is of minor consequence. CMC developed the value engineering proposals for submission to the Air Force, not for its own use. If the Air Force did not accept the proposals, CMC did not expect to recover its expenditures for the development of the proposals, since it obviously did not anticipate any other potential use for the data if the proposals were not incorporated in its coupler contracts with the Air Force. However, if the Air Force determined to use the data CMC submitted and accordingly accepted the value engineering proposals, CMC would be entitled to payment under the value engineering clause of the contract. Since the failure of the Air Force to accept the value engineering proposals would have established, for all practical purposes, the worthlessness of the value engineering proposals in CMC's hands, we attach no significance to the absence of a restrictive legend on the value engineering proposals.

We do not agree with the Government that petitioner possessed no property rights in its data because the data might be disclosed by reverse engineering or chemical analysis of the plastics in the coupler after sales of the coupler. We have already found that prior to sale the data in each of the four value engineering proposals qualified as trade secrets, know-how, or unpatented technology. See p. 540 *supra*. Until the Air Force accepted the value engineering proposals, CMC made no sales of couplers incorporating Carmelo Ofria's improvements, either to the Air Force or to any other party. Although unrestricted sales of the improved coupler would potentially have permitted the discovery of the nature of the improvements through reverse engineering or chemical analysis of the

improved coupler, thus eliminating the secrecy of the improve-
ments and the corresponding monopoly on their production,[10]
no sales were made until *after* the Air Force had accepted the
value engineering proposals, since CMC could not alter the
specifications of the contract until so ordered by the Air Force.
Thus, to the extent that the capital asset status of CMC's data
depends on whether the data qualify as trade secrets, we find
that the data supporting each of the four value engineering
proposals were trade secrets when they were sold to the Air
Force.[11] See generally R. Milgrim, Trade Secrets, sec. 2.05[4]
(1978). Moreover, we are satisfied on the evidence that the
secret aspects of the proposals were not readily ascertainable
upon inspection. And the fact that chemical analysis following
sales of the improved couplers might have theoretically
disclosed the nature of a secret formula or compound has not
been held to prevent such formulas or compounds from
qualifying as capital assets. See *United States Mineral Prod-
ucts Co. v. Commissioner*, 52 T.C. at 197; *Wall Products, Inc. v.
Commissioner*, 11 T.C. at 57–58. Even though a secret may be
disclosed by independent investigation through chemical anal-
ysis or reverse engineering, as long as the information is not
generally known in the trade, the owner of the secret possesses
a valuable right that may be sold to others who wish to avoid
the expense and delay required for independent development
of the trade secret. See *Heil Co. v. Commissioner*, 38 T.C. at
1001; cf. *E.I. duPont de Nemours & Co. v. United States*, 153 Ct.
Cl. at 286–288, 288 F.2d at 911–912. See generally Milgrim,
*supra*, sec. 2.03, at 2.23–2.24, sec. 2.05[3]. Based on all the

---

[10]Cf. *Juliano v. Hobart Manufacturing Co.*, 200 F. Supp. 453, 456 (D. Mass. 1961), affd. 303
F.2d 830 (1st Cir. 1962), where unrestricted and unconditional sales of the plaintiff's
vegetable dicing machine were held to have eliminated the trade secret qualities of the
machine.

[11]To be sure, upon acquisition of the data developed by Carmelo Ofria, the Air Force
proceeded to destroy the trade secret characteristics by disclosure in the specifications for
the manufacture of the fuze bomb coupler. Since the Air Force did not manufacture its own
coupler, CMC's data were most valuable to the Air Force when publicly disclosed, because
this would permit use of such data by all manufacturers submitting bids for the production
of couplers. Although CMC's data represented a valuable asset to CMC only while kept
secret, the data had value to the Air Force only when widely distributed to promote
competitive bidding in the procurement of couplers, and the Air Force consequently
completely disclosed the data thereby destroying the trade secret qualities inherent therein.
This circumstance does not preclude the existence of a trade secret *prior* to disclosure by the
Air Force.

evidence, we hold that CMC's "data" incorporated in the value engineering proposals constituted property for purposes of section 1221, I.R.C. 1954.

The Government further contends that CMC's value engineering proposals were held "primarily for sale to customers in the ordinary course of * * * business," and are thus excluded from treatment as capital assets by section 1221(1). We find to the contrary.

CMC engages in the business of machining metal parts for both Government and commercial clients, producing items according to the specifications furnished by its clients. Neither CMC nor Carmelo Ofria ever applied for a patent for any product, and the four value engineering proposals were the only such proposals submitted by CMC. CMC was in the machining business, not in the business of creating and selling inventions.[12] See *PPG Industries, Inc. v. Commissioner*, 55 T.C. at 1016–1017; *Speicher v. Commissioner*, 28 T.C. at 945; *Myers v. Commissioner*, 6 T.C. 258, 266 (1946); *C. A. Norgren Co. v. United States*, 268 F. Supp. 816, 824 (D. Colo. 1967); *Armco Steel Corp. v. United States*, 263 F. Supp. 749, 756 (S.D. Ohio 1966); *Allied Chemical Corp. v. United States*, an unreported case (S.D. N.Y. 1966, 17 AFTR 2d 316, 319, 66–1 USTC par. 9212, at 85,373), affd. on another issue 370 F.2d 697 (2d Cir. 1967). The evidence indicates that the sale of inventions was not an accepted and predictable part of CMC's business, and that the sales herein were isolated, nonrecurring transactions. Cf. *International Shoe Machine Corp. v. United States*, 491 F.2d 157, 160 (1st Cir.), cert. denied 419 U.S. 834 (1974). Accordingly, we hold that CMC's sales of data to the Air Force were not sales of property held for sale to customers in the ordinary course of business.

*Decisions will be entered under Rule 155.*

---

[12]Compare the Government's concession in *E.I. duPont de Nemours & Co. v. United States*, 153 Ct. Cl. at 284, 288 F.2d at 910, that the duPont company "was not in the business of selling secret processes."