T.C. Memo. 2009-51

UNITED STATES TAX COURT

THOMAS ANTHONY BACHMANN AND KATHLEEN HELEN BACHMANN,
Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21179-07.                    Filed March 11, 2009.

John E. Ellsworth, for petitioners.

George W. Bezold, for respondent.

MEMORANDUM OPINION

MORRISON, Judge: The petitioners (the Bachmanns) and the respondent (the IRS) agreed to submit this case for decision under Rule 122.  The IRS determined a deficiency of $283,882 for the taxable year 2004 and a penalty under section 6662(a) and (b)(2) of $56,776.

The issues for decision are: (1) whether a $1,369,729 net arbitration award against Salomon Smith Barney in favor of Mr. Bachmann is includable in the Bachmanns' gross income for the taxable year 2004; and (2) whether the Bachmanns are liable for the penalty under section 6662(a) and (b)(2). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue.

## Background

We adopt as findings of fact all statements contained in the stipulation of facts. The stipulation of facts and the attached exhibits are incorporated here by this reference. As the time they filed the petition, the Bachmanns resided in New Jersey.

Mr. Bachmann had been employed in the financial services industry for more than 30 years before he commenced employment with Salomon Smith Barney, Inc. (Smith Barney), against which he would later lodge an arbitration claim. The IRS has stipulated that the copy of the arbitration claim is authentic. The IRS has not stipulated that the facts alleged in the claim are true. In this opinion we frequently cite the arbitration claim. We are stating only that the relevant assertion has been made in the arbitration claim, not that we find the fact to be true.

Mr. Bachmann was a senior vice president at Tucker Anthony in its financial institution service group before he joined Smith Barney. Mr. Bachmann had spent most of his career "servicing the

needs of community banks." Bachmann developed a novel idea for smaller community banks to issue "trust preferred stock" as a group and thereby lower the cost of the issuance of such stock to each individual bank. In a trust preferred stock arrangement, the banks issue debt to a trust, which in turn issues preferred securities to investors and thereby raises cash for the banks. Eveson & Schramm, "Bank Holding Company Trust Preferred Securities: Recent Developments", 11 N.C. Banking Inst. 105, 117 n.74 (2007); Eveson, "Financial and Bank Holding Company Issuance of Trust Preferred Securities", 6 N.C. Banking Inst. 315, 327 (2002); Gergen & Schmitz, "The Influence of Tax Law on Securities Innovation in the United States: 1981-1997", 52 Tax L. Rev. 119, 133-134 n.58 (1997). Bachmann's claim asserts the following reasons why trust preferred stock is more advantageous than other financial instruments:

> 13. For each dollar a bank generates of so-called "Tier I Capital" (consisting of items including stock, undivided profits, and surplus), the bank is permitted to take in several dollars of deposits. Thus, it is advantageous for banks to increase their amount of "Tier I Capital" – since such capital enables a bank to take in more deposits, which can then be invested through loans or other instruments to generate further "Tier I Capital." In sum, "Tier I Capital" enables a bank to leverage such capital to take in many more dollars of deposits, and thus, to grow.
>
> 14. In 1992, while Bachmann was employed by Tucker Anthony, certain regulatory changes were announced which allowed, for the first time, certain non-bank entities to use the issuance of trust preferred stock ("Trust Preferreds") as "Tier I Capital." Thereafter, in 1996, further regulatory changes allowed Trust

Preferreds to be counted as Tier I Capital for the banks.
15. Authorizing Trust Preferreds to be treated as "Tier I Capital" allowed banks to create such capital more cheaply than through the issuance of common stock. Additionally, since Trust Preferreds have a debt component, banks could deduct from their taxable income the interest paid to Trust Preferreds holders. Thus, Trust Preferreds were an inexpensive way to increase a bank's capital base and profitability.

According to the claim, Mr. Bachmann's "intention was ultimately to profit from marketing his idea, through a brokerage firm, to such banks [i.e. community banks]." The claim does not indicate when Mr. Bachmann developed the idea.

Mr. Bachmann joined Smith Barney in April 1997 to become a senior vice president in Smith Barney's institutional financial group. During his employment, Mr. Bachmann disclosed to Smith Barney the group-issuance idea. In exchange, Mr. Bachmann understood that Smith Barney would "properly compensate him for its use, as well as for any additional contributions of his specialized knowledge and longstanding experience with community banks (as well as his existing employment agreement with [Smith Barney])." The claim characterizes one of the terms of Mr. Bachmann's March 5, 1997 employment agreement as follows:

he would receive (for the first two years – although never subsequently modified): (a) a monthly draw of $20,000 versus commissions (not to exceed a deficit of $160,000, at which point the deficit would be reviewed); and (b) a 40 percent payout.

This is the description found in Mr. Bachmann's arbitration claim. The employment agreement itself has not been submitted

into the record before this Court.  The record does not reveal whether the monthly draws were paid and what the amounts of the yearly payouts were, if paid at all.

Mr. Bachmann would later claim that he should have been compensated $1.5 million for Smith Barney's "use of his novel idea" and "contributions of specialized knowledge, skills, and labor."  According to the claim, Smith Barney paid Mr. Bachmann only $191,000 (in two installments in 2000) while Smith Barney earned over $6 million in fees from use of the idea.

Mr. Bachmann's claim recounts that in December 1997 he met with James Harasimowicz, a director of Smith Barney, to plan an upcoming presentation that Smith Barney would make to Merchant's Bank.  Mr. Harasimowicz supposedly expressed enthusiasm for Bachmann's group-issuance idea and said he would seek permission to pursue it from the appropriate Smith Barney managers.  In February 1998 there was a further meeting between Bachmann and Harasimowicz.  This meeting was also attended by Steven Rehms, Managing Director in the Financial Institutions Department.  Harasimowicz stated that Bachmann's group-issuance idea had been approved by the necessary Smith Barney officials.  At a later meeting, Bachmann was charged with preparing a list of banks that might be potential participants in the group-issuance idea.  Bachmann supposedly created this list, and also contacted the banks to gauge their interest.  During 1998 to 2000, the claim

recounts, Bachmann and Smith Barney expended substantial effort in marketing the group-issuance idea to community banks. These efforts consumed 5 to 6 hours of Bachmann's personal working day. Eventually, Smith Barney engineered a transaction in which 29 banks issued $230 million worth of stock pursuant to the group-issuance idea. Smith Barney earned at least $6 million of fees from this deal, which closed in March of 2000.

On November 9, 2001, apparently after leaving employment with Smith Barney, Mr. Bachmann filed an arbitration claim with the New York Stock Exchange against Smith Barney alleging breach of contract, unjust enrichment, misappropriation and conversion of Mr. Bachmann's novel idea, breach of fiduciary duty, misrepresentation, and tortious interference with prospective economic advantage. Bachmann's claim against Smith Barney is summarized in paragraphs 4 and 5 of his NYSE arbitration claim:

> 4. While employed at SSB, Bachmann disclosed his novel idea to SSB [Smith Barney] -- based on the understanding that SSB would properly compensate him for its use, as well as for any additional contributions of his specialized knowledge and longstanding experience with community banks (as well as his existing employment agreement with SSB [Smith Barney]).
> 5. SSB [Smith Barney] utilized Bachmann's novel idea, specifically requested and received significant additional assistance from him, and exploited his specialized knowledge and longstanding experience with community banks. However, despite such SSB [Smith Barney] actions -- as well as its having ultimately profited from Bachmann's idea, making more than $6 million in net fees in its first use alone -- it nevertheless refused to properly compensate him. Although Bachmann appropriately was entitled to an

amount not less than $1.5 million, SSB [Smith Barney] paid him $191,000.

Paragraph 45 lists the legal theories asserted by Mr. Bachmann:

45.  Accordingly, as a result of SSB's [Smith Barney] improper acts, Bachmann has been damaged in an amount to be determined at the hearing, but not less than $1,500,000, plus interest, including the following: a.  Breach of contract, unjust enrichment, and quantum meruit, including: (1) SSB's [Smith Barney] failure to comply with its employment agreement and other understandings with Bachmann; (2) SSB [Smith Barney] having (a) accepted the value of Bachmann's novel idea and having requested and accepted the contribution of his specialized knowledge, skills, and labor in the execution of that idea;  (b) economically enriched itself from  its usurpation of Bachmann's novel idea and the use of his specialized knowledge, skills, and labor knowing that Bachmann expected to be reasonably compensated therefor; and (c) failed to reasonably compensate him for his idea or for his contribution of specialized knowledge, skills, and labor; and (3) engaging in the other activities summarized herein; b.  Misappropriation and conversion of Bachmann's novel idea, including: (1) SSB [Smith Barney] having used Bachmann's novel idea despite the understanding that it would be treated confidentially and not used by SSB [Smith Barney] unless he was properly compensated for it; (2) SSB [Smith Barney] having led Bachmann to believe that he would be reasonably compensated for the use of such a novel idea; (3) SSB [Smith Barney] having used the novel idea, as well as having requested and utilized Bachmann's specialized knowledge, skills, and labor to make a substantial profit with the idea; (4) SSB [Smith Barney] having not reasonably compensated Bachmann either for his novel idea or his contribution of specialized knowledge, skills, and labor; and (5) engaging in the other activities summarized herein. c.  Breach of fiduciary duty, misrepresentation, and tortious interference with prospective economic advantage, including: (1) improperly inducing Bachmann to disclose his novel idea to SSB [Smith Barney] by creating the false understanding that he would be appropriately compensated; (2) improperly usurping to itself the value and economic benefits of Bachmann's novel idea and specialized services; and (3) engaging in the other activities summarized herein.

Smith Barney apparently lodged a counterclaim against Mr. Bachmann, but the counterclaim is not in the record.

The arbitrators conducted 19 hearings, but Mr. Bachmann did not introduce transcripts of any of them into the record. On March 19, 2004, the arbitrators awarded Mr. Bachmann $1,576,360 for his claim and awarded Smith Barney $206,631 for its counterclaim, with each party to pay its own attorney's fees and costs. The decision is succinct:

> The undersigned arbitrator(s) have decided and determined that in full and final settlement of all claims between the parties that: Respondent [Smith Barney] shall pay to claimant [Mr. Bachmann] $1,576,360.00. Claimant shall pay $206,631 to Respondent. Parties shall bear their own attorney's fees and forum fees.

The decision resulted in a net award of $1,369,729, which Smith Barney paid to Mr. Bachmann in 2004.[1] Smith Barney issued a Form 1099-MISC, Miscellaneous Income, for the net award to Mr. Bachmann, but the Bachmanns did not report such amount on their 2004 income tax return, which they filed on August 16, 2005.

On June 18, 2007, the IRS timely mailed the Bachmanns a notice of deficiency for the taxable year 2004, determining a deficiency in income tax of $283,882 and a penalty due to substantial understatement of income tax of $56,776 pursuant to

---

[1]The Bachmanns stipulated that "the award [he] received and the amounts paid by [Smith Barney] did not compensate him for any physical injury."

section 6662(a) and (b)(2).  The notice of deficiency included

the entire net award of $1,369,729 in the Bachmanns' gross income

while allowing an itemized deduction for attorney's fees and

costs totaling $572,063.[2]  The notice of deficiency also included

---

[2]The net payment from Smith Barney to Mr. Bachmann is composed of two cross-payments: the payment by Smith Barney of $1,576,360 on account of Mr. Bachmann's claim, and the payment by Mr. Bachmann of $206,631 to Smith Barney on account of Smith Barney's counterclaim.  It seems to us that the tax treatment of each payment should be analyzed separately.  Thus, at least in theory, the IRS could have taken the position that the $1,576,360 should be included in the gross income of the Bachmanns, and that the $206,631 payment by the Bachmanns is not deductible.  However, the IRS appears to have conceded on brief that the $206,631 payment should be deducted by the Bachmanns. The brief says:

> Counsel for respondent notes that the allowed itemized deduction is overstated by $15,000 due to the double counting of the retainer fee paid to Mr. Bachmann's counsel.  Respondent's counsel also notes that the proper reporting of the award and counter award requires inclusion of Mr. Bachmann's full award of $1,576,360 in income and allowance of the counter award to [Smith Barney] of $206,631 as an itemized deduction. Respondent is raising neither point as an issue.

For their part, the Bachmanns submit on brief that the $1,576,360 gross award is not includable in their income.  The Bachmanns do not expressly go further and argue that in the event they are allowed to exclude the $1,576,360 gross award from their income, they are also entitled to a deduction for the $206,631 payment.  We consider that the Bachmanns have waived the argument that they are entitled to a deduction if the larger payment is excluded.
In summary, we construe the IRS's position to be that the $1,576,360 payment should be included in the Bachmanns' income, with the $206,631 as a deduction from income.  We construe the Bachmanns' position to be that the $1,576,360 payment should be excluded from their income, but that they are not entitled to the $206,631 deduction if the larger payment is excluded.  Thus, the issue for us to consider is whether the $1,576,360 payment should

(continued...)

in the Bachmann's gross income, unreported dividends of $1,227 and unreported unemployment compensation of $850, both of which the Bachmanns conceded in their pre-trial memorandum as includable in their gross income and are therefore not addressed here.

The parties agreed to submit their case without a trial under Rule 122. In their opening brief, the Bachmanns argue that their claim against Smith Barney was for "an illegal taking of something of value" and does not mention lost wages or income. Therefore, they assert that the arbitration award is a "nontaxable return of capital."

In its briefs, the IRS argues that Mr. Bachmann's claims against Smith Barney "all arise from Mr. Bachmann's employment contract requiring * * * [Smith Barney] to pay him compensation for the services he rendered through application of his knowledge, experience, expertise, and creative talents in performance of those services." The IRS argues that portions of Bachmann's claim seek lost profits or royalties, and that lost profits and royalties are treated as ordinary income. The IRS argues further that Mr. Bachmann "sought to profit from implementing his idea; that profit constitutes ordinary income."

---

[2](...continued)
be included in gross income. If it is includable, then the IRS concedes the $206,631 is deductible. If it is not includable, then the Bachmanns have conceded that the $206,631 is not deductible.

Finally, the IRS argues that Bachmann has produced no evidence that he had cost basis in his idea.

Discussion

I. Income Tax Deficiency

Section 61(a) provides that "Except as otherwise provided in this subtitle * * * all income from whatever source derived" is included in gross income. The concept of gross income is to be broadly construed while statutory exceptions are to be narrowly construed. Commissioner v. Schleier, 515 U.S. 323, 328 (1995); see also United States v. Burke, 504 U.S. 229, 248 (1992) (Souter, J., concurring in judgment). The taxpayer generally has the burden of proving any amount excludable from gross income pursuant to an applicable statutory exception or general principles of tax law. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering, 290 U.S. 111, 115 (1933); Parrish v. Commissioner, 168 F.3d 1098, 1101 (8th Cir. 1999), affg. T.C. Memo. 1997-474; Weiss v. Commissioner, 221 F.2d 152, 155 (8th Cir. 1955), affg. T.C. Memo. 1954-51. The burden of proof shifts to the IRS when a taxpayer introduces relevant credible evidence with respect to any factual issue provided that the taxpayer has met the substantiation, record-keeping and administrative cooperation requirements of the Internal Revenue Code. Sec. 7491(a).

When an amount is received by a taxpayer as a result of a legal dispute, the tax treatment of the payment is determined by asking "In lieu of what were the damages awarded?" <u>Raytheon Prod. Corp. v. Commissioner</u>, 144 F.2d 110, 113 (1st Cir. 1944), affg. 1 T.C. 952 (1943). The Bachmanns assert in their opening brief that the arbitration award is excludable from gross income because it represents a return of capital for Mr. Bachmann's transfer to Smith Barney of his group-issuance idea, and not compensation for services. The Bachmanns bear the burden of proving that the award should be treated in a manner other than the treatment claimed by the IRS in the deficiency notice unless the burden shifts to the IRS pursuant to section 7491(a).

As to the Smith Barney payment, the Bachmanns' effort to exclude it from their gross income faces several problems. One such problem--an insurmountable one in our view--is that the Bachmanns have not shown that they have a tax basis in the idea. There is no evidence in the record of what Mr. Bachmann paid to create or develop the idea. The burden of proof remains with the Bachmanns because they have failed to produce credible evidence of tax basis to shift the burden under section 7491(a). Therefore, the Court is unable to find that the idea has a tax basis of anything greater than zero. This alone causes us to reject the Bachmanns' theory that the Smith Barney payment is not taxable.

Furthermore, it is questionable whether a payment by Smith Barney to Bachmann for his business ideas could be considered anything other than a payment for services.[3] One of the services that managers perform is that they come up with useful ideas. For all we know, this is what the payment was for. We do not know whether Mr. Bachmann came up with the group-issuance idea while working for Smith Barney. We do not know what Mr. Bachmann was required to do for Smith Barney under his employment agreement, or the full extent of the provisions in the employment agreement with respect to Mr. Bachmann's business ideas. In short, there is no evidence for us to find that the "idea" should be considered the property of Mr. Bachmann, rather than part of the services provided by Mr. Bachmann. Once again, the burden of proof remains with Mr. Bachmann because of his failure to produce credible evidence that the idea was his property.

Also, even if some of the arbitration award can be considered to have been paid for Mr. Bachmann's idea, and that this is different from Mr. Bachmann's <u>services</u>, we could not say how much of the payment is in exchange for the idea. The NYSE arbitration claim states that Mr. Bachmann

---

[3]See <u>Ofria v. Commissioner</u>, 77 T.C. 524, 539 n.8 (1981) ("In such a case where ideas have not been reduced to concrete inventions, there might well be a basis for questioning whether payments for such ideas could be considered anything more than compensation for services.").

> operated on the understandings (and reasonably expected) that: (a) his idea would be treated confidentially; and (b) if it were pursued by [Smith Barney], he would be appropriately compensated (i) for the value of his novel idea, (ii) for the labor he performed in its development and marketing, including specialized knowledge he contributed, and the longstanding experience with community banks he utilized to make the idea successful, and (iii) under his existing employment agreement.

Any portion of the arbitration award attributable to Mr. Bachmann's services, including his marketing efforts, is within the scope of taxable compensation for services as defined in section 61(a)(1). There is nothing in the record allowing us to determine what portion of the payment is allocable to the idea, as opposed to services. The Bachmanns have failed to shift the burden of proving this allocation under section 7491(a) because they produced no credible evidence showing which part of the payment should be so characterized; as previously stated, they produced no evidence of tax basis in the idea nor any evidence of ownership of the idea. We therefore conclude that the amount of the gross award must be included in the Bachmanns' income for the 2004 at ordinary income tax rates.[4]

_____

[4]The Bachmanns argued that the payment from Smith Barney should be excluded from their income. They did not raise the issue of whether the payment should be treated as capital gain income and taxed at capital gains tax rates. We therefore decline to address the issue.

II.  Penalty

    A.  Penalty Under Section 6662(a) and (b)

    Section 6662(a) and (b)(2) imposes a penalty upon any portion of an underpayment attributable to a substantial understatement of income tax.   A substantial understatement of income tax occurs if the tax required to be shown on the return for the taxable year exceeds the reported tax by the greater of (a) $5,000 or (b) 10 percent of the correct tax.  Sec. 6662(d)(1)(A).  In this case, the difference between the correct and reported taxes is $283,693, which exceeds 10 percent of the tax required to be shown of $290,693.  Thus, the Bachmanns can avoid the penalty only if the understatement is reduced under section 6662(d)(2)(B) or 6664(c).

    Under section 6662(d)(2)(B), the amount of the understatement for purposes of determining the amount of the penalty is reduced by that portion of such understatement attributable to (a) the tax treatment of an item by the taxpayer if there was substantial authority for such treatment at the time the return is filed or on the last day of the applicable taxable year, or (b) any item if relevant facts affecting the item's tax treatment are adequately disclosed on the return (or in a statement attached to the return) and the taxpayer has a reasonable basis for such treatment.  Sec. 6662(d)(2)(B);  sec. 1.6662-4(d)(3)(iv)(C), Income Tax Regs.  The Bachmanns did not

disclose relevant facts on their return despite having received a Form 1099-MISC from Smith Barney and had no substantial authority for their failure to include the award in their reported gross income.  The section 6662(d)(2)(B) exception is therefore inapplicable to the Bachmanns.

B. Reasonable Cause and Good Faith Exception Under Section 6664(c)

No penalty may be imposed under section 6662 with respect to any portion of an underpayment if the taxpayer had reasonable cause for the tax treatment of such portion and the taxpayer acted in good faith with respect to such portion.  Sec. 6664(c). The determination is made on a case-by-case basis taking into account all relevant facts and circumstances, including "honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge and education of the taxpayer."  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is "the taxpayer's effort to assess the taxpayer's proper tax liability."  Id. Reliance on an information return or professional advice constitutes reasonable cause and good faith if under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith.  Id.  The Bachmanns made no showing that they consulted a paid tax preparer or lawyer before filing their return despite having received a Form 1099-MISC from Smith

Barney.  Mr. Bachmann was a sophisticated finance professional employed by a large financial services firm and had the requisite educational level to understand his need to seek professional tax advice regarding the treatment of his award, especially after his receipt of the Form 1099-MISC; the law requires some diligence on the part of the taxpayer.  See <u>Vezey v. United States</u>, 84 AFTR 2d 6192, 99-2 USTC par. 50,863 (9th Cir. 1999).  The Bachmanns' mere claim that their return was accurate as filed and no underpayment exists to penalize is insufficient to avoid a penalty. See <u>Sparkman v. Commissioner</u>, 509 F.3d 1149, 1161 (9th Cir. 2007), affg. T.C. Memo. 2005-136.  Therefore, the reasonable cause and good faith exception does not apply and the Bachmanns are liable for the full amounts of both the underlying tax liability and penalty determined by the IRS.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.